LEWIS H. DENNIS *v.* HELENA E. BLANCHFIELD

[No. 382, September Term, 1980.]

*Decided April 8, 1981.*

The cause was argued before THOMPSON, MOORE and COUCH, JJ.

*H. Thomas Howell* and *John H. Mudd,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellant.

*Marvin Ellin,* with whom were *Donald F. Oakley, Jonathan Schochor* and *Ellin & Baker* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Helena E. Blanchfield, the appellee, filed a declaration in the Circuit Court for Prince George's County in which she alleged that she had suffered damages as the result of the medical malpractice of Lewis H. Dennis, M.D., the appellant, and his associate, David J. Haidak, M.D. Following a trial before a jury, a verdict in the amount of $800,000.00 was returned in favor of Mrs. Blanchfield against Dr. Dennis.[1] The verdict was reduced to $400,000.00 through remittitur, and final judgment in that amount was entered on February 13, 1980. On March 10, 1980, Dr. Dennis moved for a new trial under Md. Rule 625 b alleging that certain evidence had been discovered subsequent to the entry of judgment; the motion was denied.

The record shows that Mrs. Blanchfield, a 43 year old divorcee and mother of four, was referred to Dr. Dennis in early 1976, after she had begun to experience blurred vision. She was hospitalized and various tests were conducted; thereafter, on March 23, 1976, Dr. Dennis informed her that she was suffering from multiple myeloma, a form of cancer. Mrs. Blanchfield testified that Dr. Dennis informed her that her cancer was incurable, that she had at most one year to live, and that it would be advisable that she "get her affairs in order." Because Dr. Dennis advised her that it might prolong her life somewhat, Mrs. Blanchfield underwent chemotherapy from March 23 to April 27, 1976. The chemotherapy was discontinued because of the severity of the side effects. After the discontinuance of the chemotherapy, Mrs. Blanchfield continued to make regular visits to Dr. Dennis' office for blood tests; the last such visit occurred on August 3, 1976, when it was proposed that Mrs. Blanchfield undergo a liver biopsy so that it could be deter-

---

1. At the close of her case, Mrs. Blanchfield acquiesced in the entry of a directed verdict in favor of Dr. Haidak.

mined whether the cancer had spread to that organ. At the urging of her children, Mrs. Blanchfield refused the biopsy and sought admission to the Memorial Sloan-Kettering Cancer Center in New York. Admitted on August 19, 1976, she remained there, undergoing examinations and tests, until September 8, 1976, at which time she was released and advised that she was not then, nor had she ever been, suffering from multiple myeloma or any other form of cancer. She filed suit against Drs. Dennis and Haidak on June 23, 1977.

Medical experts, including Dr. Haidak, who was called as an adverse witness by Mrs. Blanchfield, testified that Dr. Dennis, in his diagnosis and treatment of Mrs. Blanchfield, did not conform to acceptable standards of professional care, specifically, that he lacked a sufficient basis for his diagnosis and for instituting chemotherapy and other forms of treatment. Dr. Haidak also testified, over objection, that he terminated his association with Dr. Dennis in September, 1976, one month after Mrs. Blanchfield's final visit, and that Dr. Dennis' treatment of Mrs. Blanchfield was one of the factors which contributed to his decision to leave the practice.

Evidence was presented which supported Mrs. Blanchfield's claim that Dr. Dennis' erroneous diagnosis and treatment had caused her physical and mental suffering. She testified that the chemotherapy caused nausea, vomiting, diarrhea, and weakness. She further testified that the treatment caused an uncomfortable dryness of the mouth, nose, and eyes, and that she still suffered from this condition at the time of trial. There was medical testimony that, in addition to the physical discomfort, the needless administration of chemotherapy had increased the odds that she would one day develop a true malignancy. Mrs. Blanchfield testified that the diagnosis and treatment had caused her to become extremely nervous and that she had lived for months in a state of severe depression; she stated that she suffered from chronic memory loss, an inability to concentrate, "head swims," and nightmares. A psychiatrist testified that she suffered from "anxiety depressive

reaction," that this condition had been caused by the improper diagnosis and treatment, and that she would require some two years of psychotherapy to alleviate her condition. It was also testified, that during the period when she believed her death to be imminent, she broke off her engagement to be married and was forced by the side effects of the chemotherapy to quit her job as a school bus dispatcher. She testified that she had been unable to regain this job and that, as a result, she had lost wages.

## I Arbitration

Dr. Dennis filed a timely motion raising preliminary objection, on the grounds that Mrs. Blanchfield's action was barred by her failure to submit her claim to arbitration under the Health Care Malpractice Claims statute ("HCMCS"), Md. Cts. & Jud. Proc. Code Ann. §§ 3-2A-01, *et. seq.* Dr. Dennis contends the trial court erred in denying his motion.

The HCMCS was enacted as § 1 of Chapter 235, *Laws of Maryland,* 1976, a comprehensive piece of legislation intended to alleviate a perceived crisis in Maryland in the area of medical malpractice insurance.[2] It makes submission to non-binding arbitration a condition precedent to the filing of an action for damages for medical malpractice, stating:

> "All claims, suits, and actions, . . . by a person against a health care provider for medical injury allegedly suffered by the person in which damages of more than $5,000 are sought are subject to and shall be governed by the provisions of this subtitle. An action or suit of that type may not be brought or pursued in any Court of this State except in accordance with this subtitle. An action in which damages of $5,000 or less are sought is not subject to the provisions of this subtitle." Md. Cts. & Jud. Proc. Code Ann. § 3-2A-02.

---

2. *See generally,* Attorney General v. Johnson, 282 Md. 274, 385 A.2d 57, appeal dismissed, 439 U.S. 805 (1978).

*See, Bishop v. Holy Cross Hospital,* 44 Md. App. 688, 410 A.2d 630 (1980). Section 3-2A-09 declares that the HCMCS "shall be deemed procedural in nature." Section 2 of Chapter 235 added § 482A to the Insurance Code, art. 48A; it requires the inclusion of certain provisions in insurance policies issued to health care providers. Chapter 235, § 3 amended Md. Cts. & Jud. Proc. Code Ann. § 5-109, which sets forth the statute of limitations in actions against health care providers. Section 4 repealed all laws inconsistent with the Act, while § 5, the enacting clause for Chapter 235, provided "[t]hat this act shall take effect July 1, 1976, and shall apply only to medical injuries occurring on and after that date."

Dr. Dennis' first argument is that HCMCS was intended by the legislature to apply to all malpractice actions pending on July 1, 1976, the effective date of the statute, or pursued thereafter, regardless of when the medical injury occurred. He reasons that Chapter 235, § 5, which we have set forth above, was intended to limit only the application of the "substantive" sections of the Act, §§ 2 and 3, and not the application of § 1, the HCMCS, and that, as the HCMCS is "procedural," it must be given retroactive as well as prospective effect. He would have us conclude that Mrs. Blanchfield's action in the Circuit Court, filed on June 23, 1977, was barred by the HCMCS, as an action "brought or pursued" after the effective date of the statute, regardless of when Mrs. Blanchfield's claimed medical injuries occurred. Alternatively, Dr. Dennis argues that, assuming that the application of the HCMCS is limited by § 5, Mrs. Blanchfield was nevertheless required to submit her claim to arbitration because that claim was for injuries which occurred prior to, on, and subsequent to the effective date of the Act. Drawing an analogy to the "continuing course of treatment" rule employed in interpreting statutes of limitations in malpractice cases,[3] he argues that, as Mrs.

---

3. *See,* Decker v. Fink, 47 Md. App. 202, 209, 422 A.2d 389 (1980), *cert. denied,* 289 Md. 289 (1981): "The rule is that when there is a continuing course of treatment the statute [of limitations] does not begin to run until the treatment is terminated. A corollary to this rule is that, if during the

Blanchfield continued to be under his care and treatment until August 3, 1976, at least some of the medical injuries alleged occurred subsequent to the effective date of the HCMCS.

We find the arguments unpersuasive. In *John McShain, Inc. v. State,* 287 Md. 297, 301, 411 A.2d 1048 (1980), the Court of Appeals wrote: "We have stated repeatedly that where the language of a statute is free from ambiguity, there is no need to look elsewhere to ascertain the legislative intent. [citations omitted]. Instead, the statutory language should be given effect in accordance with the clear meaning of the words taken in their ordinarily and popularly understood meaning." In the instant case the language of Chapter 235 of the *Laws of Maryland,* 1976 is free from ambiguity. Section 5 provides that "this Act . . . shall apply only to medical injuries occurring on and after . . . [July 1, 1976]." Manifestly, "this Act" refers to the whole of Chapter 235, to §§ 1-5 inclusive. We reject the argument that the application of the HCMCS is not limited to "medical injuries occurring on and after" the effective date. Similarly, we reject the argument that the medical injuries alleged by Mrs. Blanchfield occurred "on or after" that date. All of the harm, physical and mental, which Mrs. Blanchfield alleged, she alleged to have been caused by the incorrect diagnosis and by the chemotherapy. Mrs. Blanchfield was informed of that diagnosis on March 23, 1976; chemotherapy was discontinued on April 27, 1976. By April 27, 1976, the harm was done and the medical injuries had occurred. That the effects of those injuries continued to be felt by Mrs. Blanchfield thereafter is irrelevant. Also irrelevant are rules used by the courts in interpreting statutes of limitations; such rules merely govern the point at which the courts will hold that the cause of action arising out of an injury accrues. *See, Decker v. Fink, supra,* 47 Md. App. at 209-11.

---

course of treatment, the patient learns or should reasonably have learned of the injury sustained by the patient then the statute runs from the time of knowledge actual or constructive. *See also,* Waldman v. Rohrbaugh, 241 Md. 137, 215 A.2d 825 (1966).

## II Admissibility of Evidence

As we stated above, Dr. Haidak, Dr. Dennis' former associate and co-defendant, was permitted to testify, over objection, that he terminated his practice with Dr. Dennis in September, 1976. He was asked, again over objection: "Did the care and treatment that was accorded to this lady by Dr. Dennis have anything to do with your severing your business relationship with him?" He answered: "I think that it reflected a difference of philosophy in how to manage patients and how to run an office. And in that sense it did contribute to my — eventually to my leaving the practice." Dr. Dennis argues that the admission of this testimony was error. If this were error it was not prejudical. Dr. Haidak testified that in his opinion Dr. Dennis' treatment of Mrs. Blanchfield was below acceptable medical standards. Even without the testimony, to which there was objection, the jury would doubtless have inferred that the two were no longer associated and that the mistreatment of Mrs. Blanchfield was at least one of the reasons.

## III Reduction to Present Value of Future Damages

Dr. Dennis noted several exceptions to the court's instructions as to damages. The first exception was to the court's refusal to instruct the jury that it should reduce to present value any damages awarded to Mrs. Blanchfield for loss of future earning capacity. He contends that this failure was error.

There exists considerable authority in other jurisdictions to support Dr. Dennis' contention.[4] *See, e.g., Osborne v. Bessonette,* 265 Or. 224, 508 P.2d 185, 187 (1973), and

---

4. In Chesapeake and Ohio Railway Co. v. Kelly, 241 U.S. 485, 489, 36 S. Ct. 630, 60 L. Ed. 1117 (1916), the Supreme Court explained the rationale requiring the reduction to present value of damages awarded for loss of future benefits: "So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self evident that a given sum of money in hand is worth more than the like sum of money payable in the future."

authorities cited therein. *But see, Kaczkowski v. Bolubasz,* 421 A.2d 1027 (Pa. 1980) (holding that practice of discounting future lost earnings would be abandoned so as to offset effects of future inflation). It is reversible error in Maryland for a court to refuse to give such an instruction in a wrongful death action. *Walston v. Sun Cab Co.,* 267 Md. 559, 575, 298 A.2d 391 (1973), *aff'g, Sun Cab Co. v. Walston,* 15 Md. App. 113, 129, 289 A.2d 804 (1972). We have held that the giving of such an instruction in a personal injury case is not error. *Rafferty v. Weimer,* 36 Md. App. 98, 373 A.2d 64 (1977). Yet, no appellate court in this State has ever held that it is reversible error to refuse a reduction to present value instruction in an action for personal injuries.

That some doubt exists as to the correct rule to be applied in personal injury cases in Maryland is largely attributable to the presence of certain language in the opinion of the Court of Appeals in *Hutzell v. Boyer,* 252 Md. 227, 249 A.2d 449 (1969). There, in an action for personal injuries, it was argued that the trial court erred in refusing to instruct the jury that any damages awarded for diminished earning capacity were to be reduced to present value. The Court of Appeals held that "the lower court's refusal to grant such an instruction, if error at all, was [not] prejudicial error." *Id.* 252 Md. at 237. The Court did not make explicit the basis for its holding, it stated only that "reduction of damages to present value is not customary in Maryland, except in cases of wrongful death. . . ." *Id.* 252 Md. at 237-38.

The significance of the language used in *Hutzell* and the exact nature of its holding have never been made clear. Although we stated in *Lumber Terminals v. Nowakowski,* 36 Md. App. 82, 91, 373 A.2d 282 (1977), a personal injury action, that "the *holding* of *Hutzell* was that it is not prejudicial error to refuse a requested instruction that the projected earning capacity of an impaired person should be reduced to present value" (emphasis in original), it seems doubtful that the Court of Appeals viewed its decision quite that way. While confining its holding in *Walston v. Sun Cab Co.* "to the failure of the trial court to give an additional instruction

in regard to present worth in the present death case," 267 Md. at 575, the Court dismissed its discussion of reduction of present value in *Hutzell* as simply an "oblique reference to this theory . . . ." 267 Md. at 573. The Court of Appeals also approved the following statement, contained in the opinion of this Court in *Sun Cab Co. v. Walston,* 15 Md. App. at 128: "[C]haracterization of the rule as *customary* in wrongful death cases does not mean that it is any less the law in such cases, nor that a judge may properly decline to instruct the jury upon it when such instruction is requested." (emphasis in original). Referring to that statement and to the language in *Hutzell,* we observed in *Rafferty v. Weimer,* 36 Md. App. at 109, that:

> "By the same token, characterization of the rule as not customary in non-death cases does not mean it is any less the law in such cases. An analysis of the reason for the rule requiring reduction of damages to present value in death cases makes clear that the same principles should apply in non-death cases. There is neither reason nor logic in an argument that it is error not to give the present value instruction in a death case, but error to grant such an instruction in a total and permanent injury case. . . ."

In a similar vein, we commented in *Lumber Terminals v. Nowakowski,* 36 Md. App. at 91, that a "distinction made between wrongful death and personal injury cases (requiring an instruction in the former but not the latter . . .) can not be logically based upon the restricted damages allowed in wrongful death cases, and has no sound basis in principle."

We are of the opinion that, if the issue were before it, the Court of Appeals would hold that it is reversible error to refuse to instruct the jury in a personal injury action that they are to reduce to present value any damages awarded for the loss of future earning capacity. We now so hold.[5]

---

5. In the absence of expert testimony, the trial court could, of course, require counsel requesting the instructions to produce appropriate tables before the matter could be judicially noticed.

Mrs. Blanchfield argues that such an instruction was not required here because, she asserts, her claim was for wages lost up to the time of trial, not for earnings which would be lost in the future. *See generally, Adams v. Benson,* 208 Md. 261, 271, 117 A.2d 881 (1955). While her counsel did indeed argue to the jury that "I am not asking for anything into the future, I am not even asking for that, I am talking about lost income to date . . .," the court instructed the jury as follows: "You would also take into consideration any loss of earnings that she may have suffered in the past by reason of her being unable to work. And you would also take into consideration any lessening of the earning capacity that she may be reasonably expected to sustain in the future." Thus the jury was instructed that they could award the damages for lost earning capacity; we cannot say that they did not do so.

IV Instruction That Damages Are Free of Income Taxes

At trial, Dr. Dennis requested that the jury be instructed as follows: "Any damages awarded to plaintiff are not income to her within the meaning of federal and state income tax laws, and no income tax will be owed or paid thereon." The court below declined to give the requested instruction and Dr. Dennis excepted.

In support of his contention that the trial court erred in declining to give the tax instruction, Dr. Dennis relies principally upon *Norfolk and Western Railway Co. v. Liepelt,* 444 U.S. 490, 100 S. Ct. 755, 62 L. Ed. 2d 689 (1980). In *Liepelt,* a wrongful death action brought under the Federal Employer's Liability Act (FELA), *see,* 45 U.S.C. § 51 et seq., in an Illinois court, the Supreme Court held that the state court erred in refusing to instruct the jury that any damages which they awarded would not be subject to taxation as income and that they should not consider such taxes in determining the amount to be awarded. 444 U.S. at 496-499, 100 S. Ct. at 759-60. The Court reasoned as follows:

"Section 104(a)(2) of the Internal Revenue Code provides that the amount of any damages received on account of personal injuries is not taxable

income. The section is construed to apply to wrongful death awards; they are not taxable income to the recipient.

"Although the law is perfectly clear, it is entirely possible that the members of the jury may assume that a plaintiff's recovery in a case of this kind will be subject to federal taxation, and that the award should be increased substantially in order to be sure that the injured party is fully compensated. The Missouri Supreme Court expressed the opinion that '[i]t is reasonable to assume [that many] jurors [will] believe [that its verdict will] be subject to such taxes.' *Dempsey v. Thompson,* 363 Mo. 339, 346, 251 S.W.2d 42, 45 (1952). And Judge Aldisert, writing for the Third Circuit, agreed:

'We take judicial notice of the "tax consciousness" of the American public. Yet, we also recognize, as did the court in *Dempsey v. Thompson,* 363 Mo. 339, 251 S.W.2d 42 (1952), that few members of the general public are aware of the special statutory exception for personal injury awards contained in the Internal Revenue Code.

' "[T]here is always danger that today's tax-conscious juries may assume (mistakenly of course) that the judgment will be taxable and therefore make their verdict big enough so that plaintiff would get what they think he deserves after the imaginary tax is taken out of it."
'II Harper & James, The Law of Torts § 25.12, at 1327-1328 (1956),' (Footnote omitted.) *Domeracki v. Humble Oil & Refining Co.,* 443 F.2d 1245, 1251 (CA3 1971), cert. denied, 404 U.S. 883, 92 S. Ct. 212, 30 L. Ed. 2d 165.

"A number of other commentators have also identified that risk.

"In this case the respondents' expert witness computed the amount of pecuniary loss at $302,000, plus the value of the care and training that dece-

dent would have provided to his young children; the jury awarded damages of $775,000. It is surely not fanciful to suppose that the jury erroneously believed that a large portion of the award would be payable to the Federal Government in taxes and that therefore it improperly inflated the recovery. Whether or not this speculation is accurate, we agree with petitioner that, as Judge Ely wrote for the Ninth Circuit,

'To put the matter simply, giving the instruction can do no harm, and it can certainly help by preventing the jury from inflating the award and thus overcompensating the plaintiff on the basis of an erroneous assumption that the judgment will be taxable.' *Burlington Northern, Inc. v. Boxberger,* 529 F.2d 284, 297 (CA 9 1975)." (Footnotes omitted.) 444 U.S. at 496, 100 S. Ct. at 759.

We note that the rule adopted by the Supreme Court in *Liepelt* is contrary to the weight of authority in the states. *See, e.g., Vasina v. Grumman Corp.,* 492 F. Supp. 943 (E.D. N.Y. 1980) (applying New York law); *Henninger v. Southern Pacific Co.,* 59 Cal. Rptr. 76 (1967); *Davis v. Fortino & Jackson Chevrolet Co.,* 510 P.2d 1376 (Colo. App. 1973); *Gorham v. Farmington Motor Inn, Inc.,* 271 A.2d 94 (Conn. 1970); *Atlantic Coast Line Railroad Co. v. Braz,* 182 So.2d 491 (Fla. 1966); *Kawamoto v. Yasutake,* 410 P.2d 976 (Haw. 1966); *Raines v. New York Central Railroad Co.,* 283 N.E.2d 230 (Ill. 1972); *Wickizer v. Medley,* 348 N.E.2d 96 (Ind. 1976); *Anunti v. Payette,* 268 N.W.2d 52 (Minn. 1978); *Bracy v. Great Northern Railway Co.,* 343 P.2d 848 (Mont. 1959); *Chicago, Rock Island & Pacific Railroad Co. v. Kinsey,* 372 P.2d 863 (Okl. 1962); *Plourd v. Southern Pacific Transportation Co.,* 513 P.2d 1140 (Or. 1973); *Stallcup v. Taylor,* 463 S.W.2d 416 (Tenn. 1970); *General Motors Corp. v. Turner,* 567 S.W.2d 812 (Tex. Ct. Civ. App. 1978); *Norfolk Southern Railway Co. v. Rayburn,* 195 S.E.2d 860 (Va. 1973); *Crum v. Ward,* 122 S.E.2d 18 (W. Va. 1961). *But see,*

*Abele v. Massi,* 273 A.2d 260 (Del. 1970); *Dempsey v. Thompson,* 251 S.W.2d 42 (Mo. 1952); *Tenore v. Nu Car Carriers, Inc.,* 341 A.2d 613 (N.J. 1975); *Gradel v. Inouye,* 381 A.2d 975 (Pa. Super. 1977). *See generally,* Annot. 63 A.L.R.2d 1393 (1959).

The issue is one of first impression in Maryland. Although we have previously addressed, in *Lumber Terminals v. Nowakowski,* 36 Md. App. at 96-98, the question of whether an award of damages should be "reduced because of any income tax savings which may result to the plaintiff from the fact that the damages will be exempt from income tax," holding that they should not, that issue and the issue presented herein are distinct. *See, Tenore Nu Car Carriers, Inc.,* 341 A.2d at 623 ("The first problem is addressed to precision in estimating loss of future earnings; the second, to the matter of dissuading the jury from increasing a verdict on the mistaken assumption that the damages are taxable . . .").

Although the *Liepelt* holding is binding only in FELA cases, its reasoning is persuasive. Undoubtedly today's juries are tax-conscious in making their awards, *see, e.g., Towli v. Ford Motor Co.,* 292 N.Y.S.2d 8 (A.D. 1968); the instruction required in *Liepelt* is a simple and non-prejudicial way to deal with that tax-consciousness. We hold, for the reasons set forth in *Liepelt,* that the court below erred in refusing to instruct the jury that their award would not be taxed as income.

## V Miscellaneous

Dr. Dennis presents two additional contentions, of which only brief mention need be made. At trial, actuarial tables were introduced which showed that a woman of Mrs. Blanchfield's age had an additional life expectancy of 31.4 years. In its instructions to the jury, the court below, referring to those actuarial tables, stated that "the life tables . . . indicate that this lady has a life expectancy of 31.4 years." Correctly noting that such tables state the life expectancy of an average person of a specified age and not

the life expectancy of any particular individual, *see, Simco Sales Service of Maryland, Inc. v. Schweigman,* 237 Md. 180, 189-90, 205 A.2d 245 (1964), Dr. Dennis excepted to the court's instruction and now argues that the failure of the court to correct its instruction was error.

Dr. Dennis also contends that the court below abused its discretion in denying his motion for a new trial, filed, pursuant to Md. Rule 625b, on the grounds that certain evidence had been newly discovered. This evidence consisted of a report filed by Mrs. Blanchfield's employer with the Workmen's Compensation Commission which, Dr. Dennis contended, indicated that certain symptoms and ailments of which Mrs. Blanchfield complained, and which she attributed at trial to the negligent diagnosis and treatment by Dr. Dennis, were in fact attributable to a pre-existing condition.

Whether the misstatement by the trial court concerning the actuarial tables constituted reversible error and whether the court abused its discretion in denying the motion for a new trial, we need not decide. The instruction to which Dr. Dennis excepted concerned the issue of damages and the newly discovered evidence, as proffered, also concerned the issue of damages. As we hold that a new trial on the issue of damages is necessary, because the jury was not properly instructed concerning the reduction to present value and the non-taxability of the damages awarded, we need not address these additional contentions.

> *Judgment vacated.*
> *Case remanded to the Circuit Court for Prince George's County for a new trial limited to the issue of damages.*
> *Costs to be equally divided.*