699 A.2d 1194

Myrna RIVERA et al.

v.

Wallace Newton EDMONDS et al.

No. 110 Sept. Term., 1996.

Court of Appeals of Maryland.

Sept. 12, 1997.

Larry A. Ceppos (Andrew J. Marter, Armstrong, Donohue & Ceppos, Chartered, Rockville, Gary A. Godard, West & Adelman, P.C., Fairfax, VA), all on brief, for Petitioner.

Terrell N. Roberts, III (Roberts & Wood, on brief), Riverdale, for Respondent.

Thomas V. Monahan, Jr., Kelly Hughes Iverson, Goodell, DeVries, Leech & Gray, L.L.P., for Maryland Association of Defense Trial Counsel of Baltimore, MD., Amicus Curiae.

Daniel M. Clements, Leslie Hayes Russo, Israelson, Salsbury, Clements & Berkman, L.L.C., for Maryland Trial Lawyers Association of Baltimore, MD., Amicus Curiae.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI *, RAKER and ROBERT C. MURPHY (Retired and specially assigned), JJ.

RODOWSKY, Judge.

This case involves the medical malpractice statute of repose, Maryland Code (1974, 1995 Repl.Vol.), § 5–109 of the Courts and Judicial Proceedings Article (CJ). We issued the writ of certiorari to review the application, on summary judgment, of that statute in *Edmonds v. Cytology Servs. of Md., Inc.,* 111 Md.App. 233, 681 A.2d 546 (1996), a case involving allegedly negligent failures by pathologists to diagnose microscopic, invasive cancer of the uterine cervix.

---

* Karwacki, now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

I

Understanding the legal issues in the instant matter will be assisted by a preliminary review of Maryland law. CJ § 5–109(a) (the Act) reads:

"An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3–2A–01 of this article, shall be filed within the earlier of:

(1) Five years of the time the injury was committed; or

(2) Three years of the date the injury was discovered."

The triggering events for the running of the alternative periods and the length of the periods have not changed since the Act was first enacted by Chapter 545 of the Acts of 1975.[1] Section 2 of Chapter 545 provided that it "shall apply only to injuries occurring after July 1, 1975."

This Court interpreted "injuries occurring" in § 2 of Chapter 545 in *Hill v. Fitzgerald*, 304 Md. 689, 501 A.2d 27 (1985). In that case the plaintiff was first seen by the physician on January 7, 1975, and was seen on a number of occasions thereafter, with treatment ending on November 5, 1975. The plaintiff brought suit in December 1983, contending that limitations were governed by the discovery rule under the general three year statute of limitations, CJ § 5–101. 304 Md. at 692–93, 501 A.2d at 28–29. *See, e.g., Geisz v. Greater Baltimore Med. Center*, 313 Md. 301, 306–07 & n. 3, 545 A.2d 658, 660 & n. 3 (1988). Under the patient's submission the Act did not apply because the injury occurred when the misdiagnosis was made, as early as the first visit. *Hill*, 304 Md. at 692, 501 A.2d at 29. The defendant argued that the injury should be considered to occur on the last day of treatment. *Id.* at 693, 501 A.2d at 31. We did not adopt either position.

---

1. Chapter 545 of the Acts of 1975, in relevant part, provided:

"An action for damages for an injury arising out of the rendering of or failure to render professional services by a physician shall be filed (1) within five years of the time the injury was committed or (2) within three years of the date when the injury was discovered, whichever is the shorter."

This Court in *Hill* looked to *Oxtoby v. McGowan*, 294 Md. 83, 447 A.2d 860 (1982), where we construed the term "medical injuries occurring" in § 5 of Chapter 235 of the Acts of 1976 which enacted the Health Care Malpractice Claims Act (HCMCA), CJ §§ 3–2A–01 through 3–2A–09. In *Hill* we saw "no substantive distinction in the legal application" of "injuries occurring" for purposes of the Act and "medical injuries occurring" for purposes of the HCMCA. *Hill*, 304 Md. at 697, 501 A.2d at 30–31. Quoting *Oxtoby*, 294 Md. at 93–94, 447 A.2d at 866, we said in *Hill:*

> " 'The General Assembly obviously was not concerned with invasions of a legally protected interest which do not cause harm in the sense of "loss or detriment in fact...." Restatement (Second) Torts § 7(2) (defining "harm"). The Act is concerned with the invasion of legally protected interests coupled with harm.' "

304 Md. at 695, 501 A.2d at 30.

In *Hill* we described the holding of *Oxtoby* to be "that the surgeon's negligent act, coupled with the harm which resulted from leaving part of a fallopian tube and ovary in the patient, amounted to a legally cognizable wrong and hence a medical injury" which occurred prior to the operative date of the HCMCA. 304 Md. at 696, 501 A.2d at 30. We also adopted in *Hill*, for purposes of the Act, the statement from *Oxtoby*, 294 Md. at 97, 447 A.2d at 868, " 'that a medical injury occurs, within the meaning of the effective date clause, even though all of the resulting damage to the patient has not been suffered prior to the [HCMCA's] effective date.' " *Hill*, 304 Md. at 696, 501 A.2d at 30.

Under the *Oxtoby–Hill* principle, "[w]hether the original allegedly negligent misdiagnosis of Hill's condition caused some harm and therefore 'injury' prior to July 1, 1975 is a question of fact...." *Hill*, 304 Md. at 697, 501 A.2d at 31.

Rejecting in *Hill* the defendant's continuing treatment approach to when the injury occurred, we said

> "that the words of § 5–109 expressly place an *absolute* five-year period of limitation on the filing of medical malpractice

claims calculated on the basis of when the injury was committed, *i.e.*, the date upon which the allegedly negligent act was first coupled with harm."

*Id.* at 699–700, 501 A.2d at 32 (emphasis added). In other words, "the five-year maximum period under the [Act] will run its full length only in those instances where the three-year discovery provision does not operate to bar an action at an earlier date. And this is so without regard to whether the injury was reasonably discoverable or not." *Id.* at 700, 501 A.2d at 33.

*Hill* came to this Court on certified questions from the United States District Court for the District of Maryland. *Id.* at 691, 501 A.2d at 28. Consequently, we had no occasion there to apply or to review the application of the principles set forth in *Hill* to the facts of the case. The opinion is silent on whether the misdiagnosis of Hill's spinal tumor resulted in harm as of the time of the initial misdiagnosis.

## II

The action now before us consists of wrongful death and survival claims against two pathologists and their respective employers. The claims are brought by Wallace Newton Edmonds, widower and personal representative of Deborah Ann Edmonds, and by their daughter, Amanda Bree Edmonds (Plaintiffs). The pathologists are William J. Jaffurs, M.D. and Myrna Rivera, M.D., and their respective employers are Cytology Services of Maryland, Inc. and Ivan R. Mattei, M.D., P.A. Following waiver by the parties of the health claims arbitration process, the action proceeded in the Circuit Court for Prince George's County.

As alleged by the Plaintiffs, the general facts are these. Mrs. Edmonds came under the care of Dr. Joseph Murgalo in May 1980. Pap smears taken in the fall of 1981 and the spring of 1982 were "class II."[2] Dr. Murgalo took a biopsy

---

2. We understand this allegation to mean that Mrs. Edmonds had "lesions, known as cervical intraepithelial neoplasia (CIN) [that] are

specimen from the epithelium of Mrs. Edmonds's cervix which was examined by Dr. Jaffurs. His report of July 19, 1983, diagnosed "severe epithelial dysplasia—epidermoid carcinoma-in-situ." [3]

Dr. Murgalo ordered another cervical biopsy to be performed on Mrs. Edmonds at Prince George's General Hospital and Medical Center. The pathologist who examined this specimen was Dr. Rivera. She reported on July 28, 1983, a diagnosis of "foci of severe epithelial dysplasia."

In their answers to interrogatories in this action the Plaintiffs state that two of their experts, Dr. Stanley Burrows of Episcopal Hospital in Philadelphia and Dr. Edward Weiner of Mamaronek, New York, are of the opinion that "defendants Jaffurs and Rivera breached the applicable standards of care by failure to diagnose invasive carcinoma evident in the microscopic slides of the biopsies obtained on July 15, 1983 and July 28, 1983." Dr. Burrows rendered a written report in December 1990, but it is not part of the record.

On August 1, 1983, Dr. Murgalo performed a cone biopsy on Mrs. Edmonds that was examined by a pathologist who is not a party to the present action.[4] The August 1, 1983 report on

characterized by dysplastic changes confined to the cervical epithelium and showing varying degrees of disorder maturation." S.A. Cannistra, M.D. and J.M. Niloff, M.D., *Cancer of the Uterine Cervix*, 334 New Eng.J.Med. 1030, 1030 (Apr. 18, 1996) (footnote omitted). "CIN II and III are intraepithelial lesions that have the potential for progressing to invasive cervical cancer." *Id.* Figures and a table from *Cancer of the Uterine Cervix* outlining the management of pap-smear findings, the stages of cervical cancer, and the treatment of the various stages are set forth in an appendix at the end of this opinion (Appendix).

3. Severe dysplasia and carcinoma in situ are included in CIN III. See K. Nasiell, M.D., M. Nasiell, M.D. & V. Vaćlavinková, M.D., *Behavior of Moderate Cervical Dysplasia During Long–Term Follow Up*, 61 Am.J.Obstetrics & Gynecology 609, 609 & n.* (May 1983). It appears that CIN III is not considered to be a microinvasive or invasive lesion or a stage of cervical cancer. *See* Appendix, Figure 3 and Table 1.

4. Apparently, the cone specimen did not reveal any cancer when that specimen was later examined by experts engaged by the Plaintiffs.

that cone biopsy diagnosed "two minute foci of severe dyspla-
sia. All margins are free—5." [5]

Mrs. Edmonds remained free of medical complaints until
August 1988 when her gallbladder was removed. Pain experi-
enced by Mrs. Edmonds during that period was not related to
cervical cancer, in the opinion of another of Plaintiffs' experts,
Dr. Thomas S. Rocereto of Haddonfield, New Jersey. On
May 1, 1989, Mrs. Edmonds complained to Dr. Murgalo of
severe pain in the right buttocks, radiating down the right
thigh. Dr. Rocereto is of the view that the spread of the
malignant cervical tumor was causing nerve root irritation at
this time. Mrs. Edmonds was referred to an orthopedist. On
October 17, 1989, a CT scan revealed a mass in Mrs. Ed-
monds's right pelvic area. On November 8, 1989, she was
diagnosed as having fully differentiated squamous cancer.
She underwent radiation and chemotherapy treatments. Mrs.
Edmonds died on April 11, 1990, at age thirty-four, during her
second admission to Georgetown University Hospital. The
autopsy report did not reach any conclusion as to the primary
site of the cancer.

The instant legal action was filed on April 9, 1993. Drs.
Rivera and Mattei moved for summary judgment, attaching as
exhibits to their motion the Plaintiffs' statement of claim, the
three pathology reports in 1983, certain Georgetown Hospital
records, and the Plaintiffs' answers to the interrogatories of
those defendants. In their supporting memorandum those
defendants argued, imprecisely as we have seen in Part I,
*supra*, that "the alleged negligent acts or omissions by the
defendants occurred nearly ten years prior to the filing of the
Statement of Claim" and consequently, "are time barred, as a
matter of law under the [Act]." Dr. Jaffurs and his employer
also moved for summary judgment. Their exhibits added no
new material. Their memorandum recognized the rule of *Hill
v. Fitzgerald* and argued that the alleged act of misdiagnosis

---

**5.** We have not found anywhere in the record the significance, if any, of
"5" in the August 1, 1983 report.

satisfied *Hill* 's definition of "injury" under the circumstances of this case.

In their opposition to summary judgment the Plaintiffs contended that the injury to Mrs. Edmonds occurred no earlier than May 1, 1989. Excerpts from the deposition of Dr. Rocereto supplied the principal material for the Plaintiffs' factual opposition. In an oral ruling from the bench the circuit court granted summary judgment in favor of the Defendants, without articulating the court's rationale.

Plaintiffs appealed to the Court of Special Appeals. In a lengthy analysis of the Act, of cases decided under it, and of statutory and decisional law from other states, the Court of Special Appeals concluded that the Act operates in the fashion described in Part I hereof. The court, disclaiming that it was presenting "an exhaustive checklist," stated that

"the patient could suffer an 'injury' as a result of a negligent misdiagnosis, when (1) he or she experiences pain or other manifestation of an injury; (2) the disease advances beyond the point where it was at the time of the misdiagnosis and to a point where (a) it can no longer effectively be treated, (b) it cannot be treated as well or as completely as it could have been at the time of the misdiagnosis, or (c) the treatment would entail expense or detrimental side effects that would not likely have occurred had treatment commenced at the earlier time; or (3) the patient dies."

*Edmonds,* 111 Md.App. at 270, 681 A.2d at 564.

The court then vacated the judgment of the circuit court on the following rationale:

"[Plaintiffs] did not proffer any expert opinion that Ms. Edmonds's cancer had not spread at any time prior to April 9, 1988 (i.e., the date five years prior to the filing of the claim) or April 11, 1985 (i.e., the date five years prior to Ms. Edmonds's death). But [Defendants] did not advance any evidence, beyond conclusory assertions, to show that Ms. Edmonds's cancer *had* advanced during those time periods. Nor do [Defendants] contend that Edmonds suffered any

symptoms from the cancer prior to August 1988. There-
fore, we conclude that the circuit court erred...."
*Id.* at 272, 681 A.2d at 565.

This Court granted the Defendants' petitions for certiorari
in order to review this application by the Court of Special
Appeals of the rule of *Hill v. Fitzgerald.* Briefs amici have
also been filed by the Maryland Association of Defense Trial
Counsel and, in response, by the Maryland Trial Lawyers
Association.

### III

The issue in this case is the application of the Act, as
construed in *Hill,* to the facts presented in the record for
purposes of the summary judgment motion. Inasmuch as no
Defendant argues for applying the Act's alternative bar of
three years from the discovery of injury as a basis for
summary judgment, the issue is limited to the operation of the
bar against an action filed more than "[f]ive years from the
time the injury was committed." The Defendants contend
that the injuries were committed on or immediately after the
alleged misdiagnoses of July 1983, while the Plaintiffs contend
that the injuries were committed when the cancer caused the
radiating leg pain of which Mrs. Edmonds complained to her
physician on May 1, 1989.

In its application of the Act the Court of Special Appeals
considered that the date five years prior to the filing of the
Plaintiffs' action was the earliest date on which the injury
could have been committed for a viable survival claim and
considered that the date five years prior to Mrs. Edmonds's
death was the earliest date on which the injury could have
been committed for a viable wrongful death claim. *Edmonds,*
111 Md.App. at 272, 681 A.2d 546.[6] Underlying the different

---

6. The Court of Special Appeals used April 9, 1988, for the survival
claim and April 11, 1985, for the wrongful death claim. Query: Should
these dates be April 8, 1988, and April 10, 1985, respectively? See
Md.Code (1975, 1995 Repl.Vol.), Art. 94, § 2, dealing with the computa-
tion of time.

dates is a two-step approach to determining the timeliness of the wrongful death claim. Under that analysis one first determines whether the patient's medical malpractice claim was time barred on the date of death. If the claim was not time barred on the date of death, then, under CJ § 3–904(g)(1), the wrongful death claimants have three years from the date of death within which to file the Lord Campbell's action. The analysis underlying the dates used by the Court of Special Appeals is argued to us by the Defendants in support of a judgment in their favor, and that analysis is not disputed by the Plaintiffs. Consequently, no issue is presented in this case as to how the Act operates on wrongful death claims.[7]

## IV

Maryland appellate courts have addressed whether an injury occurred before or after a given date that was critical to a legal determination. Some of these cases have involved undiagnosed conditions, and they shed some light on the resolution of the issue before us.

*Johns Hopkins Hosp. v. Lehninger,* 48 Md.App. 549, 429 A.2d 538 (1981), involved the failure to diagnose an undisplaced fracture in the plaintiff's right hip in x-rays taken on January 11, 1971. The plaintiff thereafter was treated for a separate accidental injury involving a displaced fracture of the femoral neck of the right hip. Treatment, including periodic x-rays, continued until December 1973. Thereafter the plain-

---

7. In *Geisz,* 313 Md. at 320 n. 7, 545 A.2d at 667 n. 7, we expressly reserved opining whether the five years from injury alternative bar under the Act applied to wrongful death actions. In their amicus brief the Maryland Association of Defense Trial Counsel argue for a holding that the five-year bar alternative of the Act applies to wrongful death claims in the same manner as it does to survival claims. The issue, however, was not raised in the petitions for certiorari, has not been raised by the parties, and was not decided by the courts below. Consequently, we do not consider it. *See Eagle–Picher Indus., Inc. v. Balbos,* 326 Md. 179, 230 n. 15, 604 A.2d 445, 470 n. 15 (1992); *Maryland–Nat'l Capital Park & Planning Comm'n v. Crawford,* 307 Md. 1, 15 n. 6, 511 A.2d 1079, 1086 n. 6 (1986).

tiff resumed his usual activities which included running long distances and playing tennis daily. *Id.* at 552, 429 A.2d at 541. In the summer of 1977 the plaintiff was diagnosed with avascular necrosis, a bone deterioration resulting from disrupted blood supply. In an action filed in 1979 the plaintiff claimed that the defendant's negligence in 1971 and 1973 was a proximate cause of the deterioration. The defendant argued that the action should have been sent to health claims arbitration because the medical injuries continued to manifest themselves after the critical date of July 1, 1976. The Court of Special Appeals held that the plaintiff sustained medical injuries prior to that date. *Id.* at 556–57, 429 A.2d at 543. Although, "[d]uring the late summer of 1977, while playing tennis, Lehninger felt 'something snap' in his leg," followed by chronic pain in his right hip, all of which led to the diagnosis of the disease, those facts did not operate to postpone the date of injury. *Id.* at 552–53, 429 A.2d at 541.

The plaintiff in *Dennis v. Blanchfield,* 48 Md.App. 325, 428 A.2d 80 (1981), was erroneously diagnosed as having an incurable cancer and immediately underwent chemotherapy that caused nausea, vomiting, diarrhea, and weakness. *Id.* at 327, 428 A.2d at 82. The chemotherapy was discontinued April 27, 1976, by which date, the court held, "the harm was done and the medical injuries had occurred." *Id.* at 330, 428 A.2d at 84. The instant matter is not so clear cut.

The five-year alternative bar under the Act was involved in *Jones v. Speed,* 320 Md. 249, 577 A.2d 64 (1990), in a misdiagnosis context. Complaining of severe headaches, the plaintiff first visited the defendant on July 17, 1978, at which time the defendant failed to diagnose a brain tumor which could have been determined by a brain scan. There were fifteen additional visits to the defendant between August 1978 and September 1985. The brain tumor was discovered in February 1986 when the plaintiff had a seizure that led to successful brain surgery. *Id.* at 254, 577 A.2d at 66. Suit was brought in July 1986, well within three years of discovery but more than five years after the initial consultation. *Id.* at 255, 577 A.2d at 66.

The plaintiff in *Jones* pled each visit as a separate claim. Moving for summary judgment on all counts based on the Act, the defendant argued that all of the plaintiff's harm proximately resulted from the negligent failure to diagnose in July 1978. In opposition the plaintiff filed the affidavit of a neurological surgeon. It included the opinion that "[e]ach time that Mrs. Jones saw Dr. Speed, a separate medical injury occurred, because of the failure of Dr. Speed, at each of these visits, to detect a progressively worsening and changing medical condition." *Id.* at 256, 577 A.2d at 67. We held that the defendant was entitled to summary judgment only on those counts alleging harm resulting from the failure to diagnose on visits made more than five years before the suit was brought, *i.e.,* made prior to the visit of September 10, 1981. *Id.* at 261–62, 577 A.2d at 70. Summary judgment was denied, however, as to the counts involving visits within five years because there was a dispute of material fact whether the defendant "had a duty to re-examine his diagnosis or to request additional diagnostic studies at those stages of his treatment, and whether he was negligent in failing to do so." *Id.*

In *Jones* we said flatly that "[c]laims for damages occurring at an earlier time, and resulting from earlier acts of negligence on the part of the defendant, are effectively barred by [the Act]." *Id.* at 257, 577 A.2d at 68. That statement, however, did not mean that the claims based on visits within five years of suit were barred on the theory that there was no additional harm because, had a correct diagnosis been made in the visit of September 10, 1981, or in a later visit, "the pain, suffering, disability, and expense suffered from late 1981 until 1986, would have been avoided." *Id.* at 256, 577 A.2d at 67.

The Defendants place considerable emphasis on *Oxtoby,* 294 Md. 83, 447 A.2d 860, but it is, from the Defendants' standpoint, at best not inconsistent with their position. The case involved an allegedly negligently performed operation for the removal of the patient's ovaries and fallopian tubes as a preventive measure due to a family history of ovarian cancer. Not all of the left ovary and tube were removed in the surgery of February 1974. The patient "developed ovarian cancer in

or about April 1977." *Id.* at 86, 447 A.2d at 862. She underwent surgery in July 1979 and died of cancer in June 1980. In a motion for judgment made at the close of all of the evidence at a trial in a circuit court, the defendant contended that the medical injury occurred on or after July 1, 1976, so that the claims were subject to arbitration, while the plaintiff at that time contended that the evidence was sufficient for the jury to find "that cancer had arisen in [the patient] prior to July 1, 1976." *Id.* at 92, 447 A.2d at 865. The trial court ruled that the action could proceed in the circuit court. *Id.* When the jury returned a defendant's verdict the parties switched positions, and the plaintiffs contended before the circuit court and in this Court that the medical injury had not occurred prior to July 1, 1976. The trial court ruled adversely to the plaintiffs on their post-trial motion, and this Court affirmed. The record on appeal reflected that the plaintiffs, in their pre-verdict argument, had referred to evidence supporting a finding that the cancer had arisen prior to July 1976, but that evidence was not included in the record. *Id.* at 88, 447 A.2d at 863. We held that the finding of the trial judge could not be upset by the plaintiffs on appeal, absent a record from which we could review the sufficiency of the evidence on the issue of when the injury occurred. *Id.* at 92, 447 A.2d at 865. Consequently, *Oxtoby* is not a holding on the legal effect of a state of facts; rather, it is a holding on a point of appellate procedure. Nevertheless, there is an implication in *Oxtoby* that the evidence on which the plaintiffs relied, pre-verdict, for the existence of cancer prior to July 1, 1976, related to a cancer that was undetected until April 1977. Even then, however, we do not know from *Oxtoby* whether the evidence tending to support the existence of cancer in the patient prior to July 1, 1976, included evidence on whether the cancer was spreading, or whether it was symptomatic.

### V

*Hill* holds that "[w]hether the original allegedly negligent misdiagnosis ... caused some harm and therefore 'injury' prior to [the critical date] is a question of fact." 304 Md. at

697, 501 A.2d at 31. Accordingly, we shall now examine the record as it bears on when the alleged negligent misdiagnosis first caused harm to Mrs. Edmonds. The evidence set forth below consists entirely of excerpts from the deposition of Dr. Rocereto who, we infer, is an oncological surgeon. Dr. Rocereto's descriptions of Mrs. Edmonds's specific condition at any particular time are based on the reports of others.

The biopsy specimens diagnosed by the Defendants in July 1983 actually reflected that Mrs. Edmonds had at least a stage I cervical cancer, meaning a tumor that is confined to the cervix. There is a ten to fifteen percent chance of lymph nodes being involved in stage I tumors. The vast majority of cervical cancers spread locally in the pelvis. Cervical cancer does not have a particular organ to which it readily metastasizes. It can go anywhere, "depend[ing] upon how long the patient has had it." However, "the probability is [that] clinically [Mrs. Edmonds's cancer] was confined to the cervix" in July of 1983.

The extent of the invasion in July 1983 could not be measured. The Society of Gynecologic Oncologists states that a tumor that penetrates 3.1 millimeters (from the basement membrane) is a stage IB cervical cancer. Inasmuch as the reports gave Dr. Rocereto no measurement of the invasion, he believes that Mrs. Edmonds should have been treated as a stage IB in July 1983. In cases in which the pathologist cannot state the extent of invasion, Dr. Rocereto's opinion is that the patient should be treated as having "an invasive carcinoma, not as a microinvasive carcinoma." The standard of care for stage IB carcinoma of the cervix (and for some stage IAs) is either a radical hysterectomy or complete radiation therapy.

In terms of five-year cure rates and with proper treatment in July 1983 for an invasive cancer, as contrasted with a microinvasion, Mrs. Edmonds would have had a cure rate of between seventy-five and eighty-five percent. In 1989, when her cancer was diagnosed, it was at stage IVB, and her cure rate was zero.

Dr. Rocereto cannot tell where the tumor was in 1984, nor can he tell the stage of Mrs. Edmonds's disease in 1984. He testified: "I can assume it was the same, hadn't progressed much. It's impossible [to tell]. There's no records that give me any hint at all on that."

Dr. Rocereto had no opinion as to Mrs. Edmonds's prognosis in 1985, saying, "I don't have anything in the clinical picture that I see that tells me whether the cancer is advanced or not at that time." There is no rule, based on his experience, by which he can work backwards from 1989. He said:

"[C]ancer in one instance may spread rapidly and in other instances may be very slow growing, may lie dormant, so someone that does have a very early stage cancer that's undetected in one year, *five years later may be the same* and then suddenly a year later has a lot of discomfort and advancing cancer. It's one of those things about cancer that we don't understand completely."

(Emphasis added).

In a long answer explaining why he did not know whether Mrs. Edmonds's pelvic nodes were negative or positive at the time of her death, he testified:

"Cervical cancer usually spreads as a continuum, but you can get spread in small volume disease.... With cervical cancer, it doesn't have to be a big tumor moving to a big tumor moving to a big tumor, in some instances, the disease is early in the cervix and it surprises you. My feeling on this case is she had microscopic—not microinvasion, microscopic cervical cancer at the time the original biopsy was taken.... [T]here obviously was a microscopic tumor present and that tumor may have been spreading all those years as a microscopic disease very slowly, it may have been sitting dormant somewhere. Once it starts spreading, it can hit any organ in its way...."

## VI

The decision in this case turns on the nature of microscopic cervical cancer, as revealed by the record. Because the

standard of care calls for surgery or radiation treatment when the condition is diagnosed, the Defendants contend that any delay, and certainly a protracted delay, caused by a misdiagnosis is a harm within the meaning of *Hill*. Ordinarily we would have no disagreement with that assessment in a case, such as *Jones v. Speed*, 320 Md. 249, 577 A.2d 64, where the uncontradicted evidence on summary judgment is that the undiagnosed cancer was progressing and worsening during the period following the misdiagnosis, even if the cancer was asymptomatic. *Id.* at 256, 577 A.2d at 67.

■ Here, however, the evidence most favorable to the party opposing summary judgment is that the cancer that allegedly should have been detected in Mrs. Edmonds in July 1983 could remain dormant for as long as five years. The inference most favorable to the plaintiff is that there are no additional adverse consequences if the microscopic tumor remains unchanged. The Defendants have not attempted to demonstrate that Dr. Rocereto's statement is junk science. Nor did the Defendants develop from him the probability of the undiagnosed condition's remaining dormant for five years.

Five years from July 1983 would mean that the injury could have been "committed" as late as July 1988 so that the five-year bar under the Act did not operate until July 1993. The instant action was filed in April 1993. Consequently, on this record, the Defendants were not entitled to summary judgment.

In an alternative argument the Defendants submit that, in medical malpractice cases in which it cannot be determined when the injury was committed, the rule should be that the injury is presumed to have been committed when the negligent act or omission occurred, with the burden on the patient to prove when the injury was committed. The argument runs counter to the reasoning supporting our holding in *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991).

In *Newell* we held that the health care provider has the burden of proving at trial when the injury was discovered,

under the Act's alternative three-year bar. In reaching that conclusion we explained as follows:

"[S]ince unquestionably the health care provider bears the burden of pleading and proving that the action is barred under the five-year provision, we believe the legislature intended a single burden of proof and that the health care provider have the burden of pleading and proving that the claimant's action is time-barred by either of the two statutory provisions. If a health care provider pleads and proves that an action was filed after five years from the alleged negligent act, the action is time-barred."

*Id.* at 728, 594 A.2d at 1157–58.[8]

Further, it would not be a responsible exercise of judicial power to distinguish *Newell* and create an exception to the *Oxtoby–Hill* analysis. CJ § 5–109 was amended by Chapter 592 of the Acts of 1987 to add subsections (b) through (f). At that time the Act took its present format as subsection (a). Chapter 592 was introduced as an Administration Bill, Senate Bill 225. As introduced the bill would have amended then § 5–109 to measure the five-year provision from the time of "the allegedly wrongful act or omission," and not from the time "the injury was committed." This amendment was deleted in the Senate Judicial Proceedings Committee. The report of the committee explained the effect of the committee amendment as follows:

"This amendment strikes language from the bill that would have required the statute of limitations in an action for damages against a health care provider to begin to run at the time of the allegedly wrongful act or omission. The intent of the deleted language was to overturn the decision of the Court of Appeals in Hill v. Fitzgerald, 304 Md. 689 [501 A.2d 27] (1985). In that case, the court ruled that an

---

8. The negligence in *Newell* was administering excessive radiation in the treatment of a cancer. In such a case the harm is contemporaneous with the negligence. Consequently, on the facts of the case, one could speak of a bar measured by five years "from the alleged negligent act."

'injury' is committed on the date the allegedly negligent act was first coupled with harm."

The effect of the deletion of the administration proposal was to leave the Act substantially as it read when *Hill* was decided. The General Assembly was well aware that, under the Act as construed in *Hill,* there could be a window of time between the negligent act or omission and the resulting harm, and the General Assembly intended that the Act operate in the fashion construed in *Hill.* The instant case, on the present record, illustrates that window.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITION-ERS.*

# APPENDIX

Excerpts from Drs. S.A. Cannistra & J.M. Niloff, *Cancer of the Uterine Cervix*, Vol. 334, No. 16 New England Journal of Medicine 1030 (Apr. 18, 1996).

Figure 3. Algorithm for Managing Pap-Smear Findings Suggestive of an Intraepithelial Lesion.

Figure 4. Algorithm for Managing Microinvasive or Invasive Disease.

Table 1.   Staging of Cervical Cancer.*

| | |
|---|---|
| Stage I: | The tumor is confined to the uterus. |
| IA | Microinvasive disease, with the lesion not grossly visible.[†] |
| IB | Larger tumor than in stage IA or grossly visible tumor confined to the cervix.[‡] |
| Stage II: | The tumor extends beyond the uterus but does not involve the pelvic side wall or lowest third of the vagina. |
| IIA | Involvement of the upper two thirds of the vagina, without lateral extension into the parametrium. |
| IIB | Lateral extension into parametrial tissue. |
| Stage III: | The tumor involves the lowest third of the vagina or the pelvic side wall or causes hydronephrosis. |
| IIIA | Involvement of the lowest third of the vagina. |
| IIIB | Involvement of the pelvic side wall or hydronephrosis. |
| Stage IV: | The tumor demonstrates extensive local infiltration or has spread to a distant site. |
| IVA | Involvement of bladder or rectal mucosa. |
| IVB | Distant metastasis. |

* Based on the staging system established by the International Federation of Gynecology and Obstetrics.   Staging may be based on information obtained from a pelvic examination performed while the patient is under anesthesia, intravenous pyelography, cystoscopy, and proctoscopy.   The stage is determined clinically and does not change on the basis of findings at the time of surgery.

† Microinvasive disease is defined as a lesion not exceeding 5 mm in depth from the basement membrane and no wider than 7 mm.   A recent distinction has been made between stage IA1 ($\leq$ 3 mm deep and $\leq$ 7mm wide) and stage IA2 (> 3 mm but $\leq$ 5 mm deep and $\leq$ 7 mm wide).   The Society of Gynecologic Oncologists defines microinvasive disease as a lesion $\leq$ 3 mm in depth beneath the basement membrane, without evidence of involvement of the lymphovascular space.

‡ A recent distinction has been made between stage IB1 lesions ($\leq$ 4 cm in diameter) and stage IB2 lesions (> 4 cm in diameter).   (Footnotes omitted).