*Linda Thomas v. David Shear*
No. 2669, Sept. Term, 2018
Opinion by Leahy, J.

**Motion for Summary Judgment > Contradictory Affidavit or Statement**

The trial court correctly determined that affidavits of the plaintiff's experts were materially inconsistent with the prior deposition testimony of the experts and should be disregarded pursuant to Maryland Rule 2-501(e). The affidavits, in which the experts opined that kidney stones, and not the surgical clip, caused Ms. Thomas's hydronephrosis in 2006 is explicitly opposite to their sworn deposition testimony that the surgical clip caused Ms. Thomas's 2006 hydronephrosis.

**Motion for Summary Judgment > Genuine Dispute of Material Fact**

The trial court properly disregarded the plaintiff's attempt to create a genuine dispute of material fact with the defense experts' testimony in order to avoid summary judgment. "To defeat a defendant's motion for summary judgment, the opposing party must present admissible evidence 'upon which the jury could reasonably find for the plaintiff.'" *Rogers v. Home Equity USA, Inc.*, 453 Md. 251, 263 (2017) (quoting *Hamilton v. Kirson*, 439 Md. 501, 522-23 (2014)). Because the plaintiff could not adopt the defense experts' testimony to avoid the statute of limitations without concomitantly sinking her prima facie case, her submission of the defense experts' testimony did not preclude the circuit court from granting summary judgment in favor of the defendant.

**Motion for Summary Judgment > Medical Malpractice Statute of Limitations > Burdens of Proof**

The health care provider bears the burden of pleading and proving that an action is barred under the five-year provision of Maryland Code (2006, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 5-109(a). *Newell v. Richards*, 323 Md. 717, 728 (1991). In addition, the burden is upon the party moving for summary judgment to demonstrate an absence of material fact and that the party is entitled to judgment as a matter of law. *See Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 660 (2000). Once the moving party meets the initial burden of establishing the "absence of a genuine issue of material fact," the burden shifts to the non-moving party to show why the applicable statute of limitations does not bar her claim as a matter of law, or "identify with particularity the material facts that are disputed." *Id.* at 660 (citations omitted).

**Motion for Summary Judgment > Medical Malpractice Statute of Limitations > "Injury"**

The trial court correctly granted the health care provider's motion for summary judgment because the plaintiff failed to file her malpractice claim within "[f]ive years of the time the injury was committed." CJP § 5-109(a)(1). Viewing the evidence in the light most favorable to the plaintiff, the record demonstrated that the health care provider negligently placed a clip on her right ureter during a procedure in 2000. Plaintiff's experts proved that the harm to the plaintiff was contemporaneous with the negligence and she thus suffered an "injury" in 2000, even though she may not have experienced pain at that time.

Circuit Court for Baltimore County
Case No. 03-C-17-005647

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2669

September Term, 2018

_____

LINDA THOMAS

v.

DAVID SHEAR

_____

Nazarian,
Leahy,
Friedman,

JJ.

_____

Opinion by Leahy, J.

_____

Filed: August 27, 2020

*Fader, Matthew J., C.J., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Linda Thomas appeals from the decision of the Circuit Court for Baltimore County granting summary judgment in favor of David Shear, M.D., appellee. Ms. Thomas alleges that Dr. Shear committed medical negligence by placing a surgical clip on her right ureter[1] during a surgical procedure performed on May 26, 2000 at Greater Baltimore Medical Center ("GBMC"). On May 2, 2016, she filed a Statement of Claim before the Health Care Alternative Dispute Resolution Office and, on June 12, 2017, she filed a complaint in the circuit court.

More than a year later, after deposing plaintiff's experts, Dr. Shear moved for summary judgment on the ground that Ms. Thomas's claim was barred by the statute of limitations under Maryland Code (2006, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 5-109. Dr. Shear asserted that any alleged medical injury occurred on the date of the surgery in 2000 or, alternatively, in 2006 when Ms. Thomas visited GBMC and was diagnosed with hydronephrosis.[2]

Ms. Thomas countered that, although Dr. Shear's negligent act of placing the surgical clip occurred in 2000, her injury did not occur until 2014 when she was admitted to Northwest Hospital Center with severe abdominal pains. In support of her opposition to summary judgment, Ms. Thomas submitted two affidavits in which her expert witnesses

---

[1] The ureter is the "tube that conducts the urine from the renal pelvis to the bladder[.]" *Stedman's Medical Dictionary* 2017 (28th ed. 2006).

[2] Hydronephrosis is a "[d]ilation of the pelvis and calyces of one or both kidneys" that "may result from obstruction to the flow of urine," among other causes. *Stedman's Medical Dictionary* 912 (28th ed. 2006). In other words, as Dr. Shear wrote in his brief, hydronephrosis "is a condition that occurs when urine cannot drain out of the kidney to the bladder due to a blockage or obstruction of the ureter."

renounced their earlier deposition testimony that her 2006 hydronephrosis was caused by the surgical clip. Instead, they newly opined that the hydronephrosis in 2006 was caused by kidney stones. Ms. Thomas also tendered the deposition testimony of Dr. Shear's experts—that he did not negligently cause her harm in 2000, 2006, or 2014—in support of her experts' revised opinions that the injury did not occur in 2006. Dr. Shear moved to strike the affidavits on the basis that they were materially inconsistent with Ms. Thomas's experts' prior sworn statements.

At a hearing on October 23, 2018, the court agreed with Dr. Shear that the affidavits were materially inconsistent and granted his motion for summary judgment on the basis that Ms. Thomas's claim was barred by the statute of limitations.

Ms. Thomas timely noted her appeal and presents four questions for our review,[3] which we have consolidated and rephrased:

---

[3] Ms. Thomas's questions presented as written in her brief are as follows:

1. "Did the trial court err when it refused to consider [Ms. Thomas's] two experts' affidavits submitted to oppose [Dr. Shear's] motion for summary judgment?"
2. "Did the trial court err in granting [Dr. Shear's] motion for summary judgment given [Ms. Thomas] supported, in part, her opposition with [Dr. Shear's] retained experts' deposition testimony, testimony which opined that the July 19, 2006 presentation, including the finding of hydronephrosis[], was caused by renal cholic or kidney stones, not a retained clip, thereby creating a dispute of material fact?"
3. "Did the trial court err when it concluded that hydronephrosis alone, unaccompanied with pain, lack of urine output, or other outward manifestation of injury, was an injury within the meaning of § 5-109 of the Courts and Judicial Proceeding[s] Article?"
4. "Did the trial court err in denying [Ms. Thomas's] motion for summary judgment given [Dr. Shear's] burden of proof on the issue and the

(Continued)

2

1. Did the circuit court err in determining that Ms. Thomas could not rely on the affidavits of her experts to support her opposition to Dr. Shear's motion for summary judgment?

2. Did the defense experts' testimony create a material issue of fact precluding summary judgment?

3. Did the circuit court err in granting summary judgment in favor of Dr. Shear on the basis that Ms. Thomas's claim was time barred under CJP § 5-109?

For the reasons that follow, we discern no error in the court's decision to disregard Ms. Thomas's experts' affidavits, and we hold that the court properly determined that her claim was time barred under CJP § 5-109.

## BACKGROUND

### A. The Complaint

On May 26, 2000, David Shear, M.D., performed an aorto-bifemoral bypass graft[4] on Linda Thomas at GBMC. Sixteen years later, on May 2, 2016, Ms. Thomas filed a medical malpractice claim against Dr. Shear with the Health Care Alternative Dispute

---

undisputed testimony from both of [Dr. Shear's] retained experts that [Dr. Shear] did not place any clip across any portion of [Ms. Thomas's] ureter and [Dr. Shear] did not cause any of [Ms. Thomas's] alleged injuries?"

(Footnote omitted).

[4] Plaintiff's expert, Dr. Paul Brown, described an aorto-bifemoral bypass graft as a procedure that involves "the top end of the aorta of the graft [being] sewn on to the top part of the aorta [], generally right below the level of where the kidneys come off." Dr. Shear explained in his brief that the surgical procedure "create[s] a new path around an obstructed blood vessel running between the aorta and a femoral artery."

3

Resolution Office.[5]  Dr. Shear elected to waive arbitration and the matter was transferred to the Circuit Court for Baltimore County.

In her complaint against Dr. Shear, filed on June 12, 2017, Ms. Thomas alleged that "[o]n **May 26, 2000**, [Dr. Shear] performed an ao[rt]o-bifemoral bypass graft" and that certain surgical clips used during the procedure "were not appropriate or not properly removed." (Emphasis added).  The complaint further alleged that:

> 3. **On January 6, 2014, [Ms. Thomas] began to have severe abdominal pains.**  She was admitted to Northwest Hospital Center at which time after discussing with the urologist, a cystoscopy was recommended.

---

[5] Under the Health Care Malpractice Claims Act ("HCMCA"), CJP §§ 3-2A-01, et seq., a person claiming medical injury committed by a health care provider and more than $30,000 in damages must first file a claim with the Director of the Health Care Alternative Dispute Resolution Office.  CJP §§ 3-2A-02(a)(1), 3-2A-04(a).  Judge Adkins explained the statutorily-imposed procedure in *Davis v. Frostburg Facility Operations, LLC*:

> Once filed in the ADR Office, the claim is subject to non-binding arbitration.  *Id.* § 3-2A-04.  We characterize this arbitration as non-binding because the plaintiff, or any other party, may unilaterally waive the arbitration requirement after meeting certain conditions outlined in the statute.  *Id.* § 3-2A-06B.
>
> A plaintiff must also file, within 90 days of initially submitting a claim, an expert certification of the claim before unilateral waiver is permitted.  *Id.* § 3-2A-04(b)(1)(i).  The claims certification must include a report prepared by the same expert.  This requirement reflects the General Assembly's desire to root out "nonmeritorious medical malpractice claims." *D'Angelo v. St. Agnes Healthcare Inc.*, 157 Md. App. 631, 645 (2004).  The expert certification requirement can also assist the parties in evaluating the merits of health claims and defenses.  *Walzer v. Osborne*, 395 Md. 563, 583-84 (2006).
>
> Once the expert certification is filed, either party can make a speedy exit from the ADR process.  CJP § 3-2A-06B(b)(1).  Indeed, most claimants elect to proceed to circuit court after satisfying compliance with the expert certification and report requirement.

457 Md. 275, 286-87 (2018) (footnote omitted).

4. On February 5, 2014, at Northwest Hospital Center, cy[s]toscopy was attempted, but multiple clips were encountered. . . .

5. As a result of the ongoing presence of the clips, [Ms. Thomas's] medical condition has remained complicated and she has experienced considerable pain and suffering, had multiple surgical procedures to address the matter and was otherwise injured and damaged.

(Emphasis added). The complaint concluded that Dr. Shear "breached the standard of care by leaving the clips behind and was otherwise negligent" and, "[a]s a direct and proximate result, [Ms. Thomas] was injured and damaged[.]"

## B. Motion to Dismiss

On July 31, 2017, Dr. Shear filed a motion to dismiss, arguing that Ms. Thomas's claims were time barred under CJP § 5-109(a). Although Dr. Shear denied Ms. Thomas's allegations that he "inappropriately placed a surgical clip on the right ureter during the aorto-femoral bypass surgery," he argued, "for purposes of th[e] motion only, there could be no dispute that IF [he] actually did place an occluding surgical clip on the right ureter during the 2000 surgery, then Ms. Thomas sustained a medical injury as of the date of that surgery." In her opposition to Dr. Shear's motion, Ms. Thomas agreed that, under CJP § 5-109(a), she was "obligated to file her complaint within five years [of] the time the injuries [were] committed or three years of the date the injury was discovered[.]" In Ms. Thomas's view, the "injury was committed not when the clips were left behind," but "when [she] began to experience severe abdominal pain from the presence of the clips" in 2014. The court held Dr. Shear's motion for further information in an order entered on October 27, 2017.

5

## C. Expert Depositions

Ms. Thomas designated several expert witnesses, including Dr. Paul Brown, Dr. Mark Kaye, and Dr. Carl Blond, who were all deposed prior to the summary judgment motion.[6] As experts for the defense, Dr. Shear designated, among others, Dr. James Black and Dr. Joseph Harryhill, who were not deposed by Ms. Thomas's counsel until after the motion for summary judgment was filed.

During the discovery period, Ms. Thomas produced records documenting her 2006 visit to GBMC. She presented with right flank pain, nausea and vomiting, and hematuria, or blood in the urine. The Radiology Department performed a CT scan of Ms. Thomas's abdomen and pelvis, and reported the following findings:

> CT ABDOMEN FINDINGS: **The right kidney contains a 4 mm stone anteriorly. A 3 mm stone posteriorly, both in the lower pole. There is moderate right hydronephrosis present.** The right ureter is dilated and can be followed for a short distance. No definite stone is seen at the transition zone. The ureter in the upper pelvis is normal in caliber.
>
> The left kidney contains a 3 mm stone in the lower pole. No hydronephrosis is present.
>
> **Cholecystectomy clips are present**. The lung bases show minor fibrosis. The liver, spleen, pancreas, and adrenal glands show no acute findings.
>
> The [sic] are **clips present adjacent to the aorta**, that appear related to aortic bypass graft. There are **clips present along the right psoas muscle and adjacent to the ascending colon**. . . . .

---

[6] Only portions of the transcripts of the experts' depositions were made part of the record at the summary judgment stage. Dr. Kaye's deposition testimony was not part of the record at summary judgment at all. Dr. Shear explained in his motion for summary judgment that a transcript of Dr. Kaye's deposition was not available at the time of filing.

CT PELVIS FINDINGS: **Aortobi-femoral bypass graft has been performed. There are multiple clips present.** Clips are present in the inguinal region.

No stone is seen in the bladder. No definite stone is shown along the course of either ureter. There is a clip in the pelvis. . . . .

IMPRESSION:
1. Small stones in the lower pole calyces of each kidney.
2. **Moderate right hydronephrosis and proximal right hydroureter, without definite stone identified.**
3. **Aorto-femoral bypass graft**.
4. Chronic changes as described.

(Emphasis added). Walter Hettinger, a physician in the Emergency Department, completed Ms. Thomas's departure information. He indicated that her diagnosis was "right kidney stone" and her condition was "satisfactory."

As more fully described in our discussion below, plaintiff's expert, Dr. Brown, testified during his deposition, upon examination of the CT scan of Ms. Thomas's abdomen from July 2006, that the hydronephrosis "would be from the clip [placed in 2000], because we know that there was a clip across the ureter." He further agreed that a kidney stone did not cause an obstruction of Ms. Thomas's ureter in 2006 because the report "says, [s]mall stones in the lower pole of the kidney, but there[']s no kidney stone causing the problem." Similarly, Dr. Blond testified that, to a reasonable degree of medical probability, he believed the cause of the hydronephrosis in 2006 "was from [] the original clip in 2000." In a later email to defense counsel, however, Ms. Thomas's counsel supplemented Dr. Blond's testimony "[r]egarding the 7/19/2006 GBMC Er visit":

Dr. Blond will testify that if the hydronephrosis caused the right flank pain, then the pain would continue from that day forward. If the pain subsided, then the hydronephrosis did not cause the right flank pain. His opinion is

7

that the treaters were much more concerned about the [kidney] stones and the stones better explain the pain complaints. Dr. Blond is of the opinion that the clip did not cause the right flank pain.

Defense expert, Dr. Black, deposed that "kidney stones" was a "reasonable diagnosis" following Ms. Thomas's complaint of right flank pain and hematuria. In light of his opinion that there was no clip on the ureter from 2000 on, Dr. Black stated that he did "not believe anything in 2006 had anything to do with a clip that would have, hypothetically, been placed in 2000 on the ureter." Dr. Harryhill, during his deposition, agreed that the documents from the 2006 GBMC visit indicated a "final diagnosis [of] renal colic. And it looks like it says right kidney stones." He testified that "it's not likely that a partially obstructed ureter would cause hematuria" and that he had "not seen any films to show obstruction from stones in the ureter." Dr. Harryhill further indicated that "a patient who is experiencing flank pain or colic . . . may have associated nausea and vomiting. We see that with partial obstruction from kidney stones quite often."

## D. Motion for Summary Judgment

Following the deposition of plaintiff's experts but before his own experts had been deposed, on September 7, 2018, Dr. Shear filed a motion for summary judgment pursuant to the applicable statute of limitations, CJP § 5-109(a).[7] He again argued that

> there could be no dispute that IF [he] actually did place an occluding surgical clip on the right ureter during the 2000 surgery, then Ms. Thomas sustained a medical injury as of the date of that surgery given that the clip placement would have (at least partially) obstructed the ureter and caused a pressure increase in the ureter relating to the urine flow from the kidney to the bladder.

---

[7] The motion was erroneously titled as a "Motion to Dismiss Pursuant to the Statute of Limitations," but it was properly treated by the court as a motion for summary judgment during a subsequent hearing.

8

Dr. Shear asserted, therefore, that Ms. Thomas's May 2, 2016 claim came "almost sixteen (16) years after the alleged negligence which is the subject of the [] action" and was time barred by CJP § 5-109(a). In the alternative, Dr. Shear contended, because the CT scan performed at GBMC on July 19, 2006 revealed hydronephrosis, there was "absolutely no dispute that [Ms. Thomas] had a clinical manifestation (hydronephrosis) in July, 2006 that [Ms. Thomas's] own experts concede[d] was a result of the surgical clip which is alleged to have been negligently placed." Dr. Shear concluded that "[e]ven under this analysis, the statute of limitations would have run in July, 2011."

Ms. Thomas filed an opposition to Dr. Shear's motion and a counter-motion for partial summary judgment on the statute of limitations. Surprisingly, and contrary to the deposition testimony of her experts, Ms. Thomas asserted that Dr. Shear's "negligence did not cause [her] 2006 clinical presentation or Abdominal CT scan findings." She acknowledged Dr. Brown and Dr. Blond's deposition testimony that the 2006 admission was caused by the surgical clip on her right ureter, but claimed that her experts "did not have the benefit of the full chart review for the July 19, 2006 ED presentation when they were deposed." She attached as exhibits affidavits from both doctors, contending that "[u]pon further review and based upon review of the July 19, 2006 chart, each physician is of the opinion that the July 19, 2006 admission [to GBMC] had nothing whatsoever to do with [Dr. Shear's] negligence, but was the result of [Ms. Thomas] experiencing kidney stones[.]" Consequently, Ms. Thomas urged that her experts were in accord with the defense's expert witness, Dr. Black, that "the hydronephrosis and stricture [in 2006] was

9

not caused by [Dr. Shear's] 2000 breach of the standard of care." Thus, Ms. Thomas contended, "[a]s a matter of law, as of 2006, [she] did not suffer an injury within the meaning of [CJP § 5-109]." As to her counter-motion for summary judgment, Ms. Thomas asserted that Dr. Shear could not create a genuine dispute of material fact about whether she sustained an injury in 2006, so "if a motion for summary judgment [were] to be granted, it should be granted in [her] favor[.]"

Dr. Shear filed an opposition to Ms. Thomas's motion for summary judgment contemporaneously with a motion to strike the affidavits of Dr. Brown and Dr. Blond. He urged the court to strike the affidavits because they were "wholly inconsistent with each expert's deposition testimony as it relates to the finding of hydronephrosis in 2006[.]" He then noted that the defense theory, which was supported by Dr. Black's testimony, was that "Dr. Shear never placed a surgical clip over the ureter and did not cause any partial or complete obstruction of the ureter following [the] 2000 aorto-bifemoral bypass surgery." Thus, Dr. Shear pressed, it was confounding that Ms. Thomas would argue that the defense experts' testimony "that the 2006 hydronephrosis was not due to an obstruction resulting from a misplaced surgical clip somehow supports [her] claims as to the application of the statute of limitations." Despite Ms. Thomas's contention that Dr. Brown did not review the entirety of the 2006 GBMC chart prior to his deposition, Dr. Shear asserted "[u]pon information and belief, [Ms. Thomas's] counsel was in possession of those records prior to and at the time of Dr. Brown's deposition."

10

Ms. Thomas filed additional support for her opposition to Dr. Shear's motion for summary judgment, including excerpts from the deposition of defense expert, Dr. Harryhill, which had become available.

### E.  Motions Hearing

On October 23, 2018, the parties presented argument before the court on the foregoing motions.  At that time, the discovery deadline had passed, and all experts had been deposed.  Counsel for Dr. Shear argued first that "because the testimony from the plaintiff's experts is that the surgical clip was placed over the ureter during the May 2000 surgery, that clips do not migrate[,] and it was . . . causing some blockage of the urine flow from the kidney to the bladder," Ms. Thomas had a legally cognizable injury at that time. In counsel's view, the statute of limitations "should start in 2000 when the clip was placed and the five year statute would have run in 2005."  If the court was not persuaded that there was an injury in 2000, counsel continued, both of Ms. Thomas's experts, in their sworn deposition testimony, "agree[d] that in 2006 there was a clinical manifestation of this surgical clip that they believe was placed across the ureter improperly at the time of the subject surgery in 2000."  Counsel maintained that the plaintiff's experts' "materially inconsistent" affidavits should not be considered.

In turn, counsel for Ms. Thomas argued that an injury within the meaning of CJP § 5-109 was not committed at the time of the surgery in 2000 because "[a]ll Dr. Shear did was clip the ureter" and the "injury and all its consequences had yet to surface."  Counsel clarified that while the negligent act took place in 2000, the negligent act and the injury "did not occur concurrently" and "the first injury was that pain to [Ms. Thomas's] right

11

side when she went to the hospital" in 2014. When asked about the affidavits from Dr. Brown and Dr. Blond, counsel asserted that the defense "cherry picked and showed to the experts" only the 2006 CAT scan.

The judge delivered an oral ruling. She pointed out that, according to Ms. Thomas, "Dr. Shear . . . committed a negligent act which forms the basis of this suit on May 26th, 2000[.]" Citing *Hill v. Fitzgerald*, 304 Md. 689, 700 (1985), the judge noted that the "purpose of the [s]tatute of [l]imitations . . . is to contain the 'long tail effect of the discovery rule in medical [mal]practice cases by restricting in absolute terms the amount of time between the alleged negligence and filing of the claim.'" Then, she observed, "[a]ccording to the deposition testimony of the Plaintiff's experts, both Dr. Brown and Dr. Blond, the hydronephrosis that was diagnosed in 2006 was causally related to [Dr. Shear's] malpractice in placing the surgical clip improperly over or on the ureter back in May of 2000."

The judge decided that the statute of limitations "ran *at the latest* when [Ms. Thomas] presented to GBMC in 2006, July of 2006." (Emphasis added). She explained that

> at the time of the depositions of Plaintiff's experts they were asked about the causal relationship between [Ms. Thomas's] complaints in 2006 when she presented to the hospital and the alleged improper placement of the surgical clip during the surgery in May of 2000. **They opined to a reasonable degree of medical certainty that the 2000 surgical event was the cause.** And that being the case, they also indicated that they did not consider kidney stones the cause. **I know that there have been some affidavits that are materially inconsistent[,] in this Court's opinion[,] filed after the motion for summary judgment. I don't believe that [Ms. Thomas] should be entitled to rely upon them.** But in any event, because of what the Court [of Appeals] said in Hill versus Fitzgerald, [304 Md. 689 (1985),] because you

12

have to put some type of restriction in absolute terms about the amount of time that the Plaintiff is allowed to file a suit, **the Court finds that these claims, this claim is time barred as a matter of law**[.]"

(Emphasis added). Accordingly, the court granted Dr. Shear's motion for summary judgment and denied Ms. Thomas's counter-motion for partial summary judgment.

Ms. Thomas timely noted her appeal to this court on October 30, 2018.

## DISCUSSION

Ms. Thomas challenges the court's determination that her claim against Dr. Shear stemming from the 2000 procedure was time barred under CJP § 5-109. Consistent with her arguments before the motions court, she contends that Dr. Shear "committed medical malpractice when he placed a surgical clip on [her] right ureter" during a procedure on May 26, 2000, but maintains that she did not sustain an injury, for purposes of the statute of limitations, until "January 5, 2014, when [she] suffered pain for three straight days." Ms. Thomas contends the circuit court erred in granting summary judgment for three reasons:

1. The court failed to consider the affidavits of plaintiff's experts, which created a material dispute of fact as to whether her injury was sustained in 2006;

2. The defense experts' testimony that Dr. Shear's alleged negligence did not cause Ms. Thomas' harm in 2006 created a material issue of fact that should have gone to the jury for consideration; and

3. As a matter of law, Ms. Thomas's claim is not time barred under CJP § 5-109 and summary judgment was improper.

As we will explain, Ms. Thomas misapplies CJP § 5-109 and misconstrues the applicable burdens of proof.

13

# I.

## Applicable Law

### A. Burdens of Proof

Maryland Rule 2-501(a) provides that "[a]ny party may file a written motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." The rule is relatively straightforward, but it is important to decipher the shifting burdens of proof that precede a summary judgment ruling, especially, here, in apposition to the shifting burdens that give rise under CJP § 5-109.

At the trial court level, the party moving for summary judgment has the burden of demonstrating to the court the absence of any genuine issue of material fact and demonstrating that it is entitled to judgment as a matter of law. *Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 660 (2000). "Once the moving party provides the trial court with a *prima facie* basis in support of the motion for summary judgment, the non-moving party is obliged to produce sufficient facts admissible in evidence, if it can, demonstrating that a genuine dispute as to a material fact or facts exists." *Thomas v. Bozick*, 217 Md. App. 332, 340 (2014) (quoting *Dolan v. McQuaide*, 215 Md. App. 24, 31 (2013)). In other words, "[o]nce the movant makes [t]his showing, *the burden shifts to the nonmoving party* to 'identify with particularity the material facts that are disputed.'" *Nerenberg*, 131 Md. App. at 660 (emphasis added) (citing Md. Rule 2-501(b)). The nonmoving party must proffer facts that would be admissible in evidence to show that there is a genuine dispute as to a material fact. *Hamilton v. Kirson*, 439 Md. 501, 522 (2014) (citation omitted).

14

Even where no genuine dispute of material fact is found to exist, the court must still find that the movant is entitled to judgment as a matter of law under Rule 2-501(f); consequently, the non-moving party may defeat summary judgment by proving that the undisputed facts are susceptible to inferences supporting their case, *Ashton v. Brown*, 339 Md. 70, 79 (1995), or by establishing that the law does not support judgment in the moving party's favor, *see* Md. Rule 2-501(a).

## B. Standard of Review

On appeal, we review a circuit court's decision to grant summary judgment without deference. *Andrews & Lawrence Prof.'s Servs., LLC v. Mills*, 467 Md. 126, 146 (2020). Thus, "we independently review the record to determine whether the parties properly generated a dispute of material fact, and, if not, whether the moving party is entitled to judgment as a matter of law." *Kennedy Krieger Inst., Inc. v. Partlow*, 460 Md. 607, 632 (2018) (quoting *Chateau Foghorn LP v. Hosford*, 455 Md. 462, 482 (2017)). In doing so, "[w]e review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Id.* at 632-33 (quoting *Chateau Foghorn LP*, 455 Md. at 482). Ordinarily, we "review a grant of summary judgment only upon the grounds relied upon by the trial court." *Hamilton,* 439 Md. at 523 (citation omitted).

## C. CJP § 5-109

"Statutes of limitations are enacted typically to encourage prompt resolution of claims, to suppress stale claims, and to avoid the problems associated with extended delays in bringing a cause of action, including missing witnesses, faded memories, and the loss of

15

evidence." *Anderson v. United States*, 427 Md. 99, 118 (2012). The statute of limitations

for suits against health care providers is set forth in CJP § 5-109:

> An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider . . . shall be filed within **the earlier** of:
>
> (1) Five years of the time the injury was **committed**; or
>
> (2) Three years of the date the injury was **discovered**.

CJP § 5-109(a) (emphasis added).

Although the "triggering events for the running of the alternative periods and the

length of the periods have not changed since [CJP § 5-109(a)] was first enacted by Chapter

545 of the Acts of 1975[,]" *Rivera v. Edmonds*, 347 Md. 208, 210 (1997) (footnote

omitted), the statute has sparked confusion and generated at least six certified questions to

the Court of Appeals since its enactment. *See Anderson v. United States*, 427 Md. 99

(2012); *Piselli v. 75th St. Med.*, 371 Md. 188 (2002); *Hill v. Fitzgerald*, 304 Md. 689

(1985).[8]

---

[8] Prior to 1975, the general three-year statute of limitations for civil actions (CJP § 5-101) applied to medical malpractice cases. Indeed, it appears the common law discovery rule was first applied in medical malpractice cases. *See Hahn v. Claybrook*, 130 Md. 179, 187 (1917). The discovery rule tolls the accrual date of an action until such time as the potential plaintiff either discovers her injury or should have discovered it through the exercise of due diligence. Eventually, the Court of Appeals extended the rule to apply "generally in all actions," unless a statute prescribes differently. *Poffenberger v. Risser*, 290 Md. 631, 636 (1981). Later the Court expounded, "[t]o retain the requisite flexibility to apply the rule to different situations, this Court has always retained to itself the power to shape the contours of the discovery rule." *Doe v. Maskell*, 342 Md. 684, 691, (1996).

In 1975, "in reaction to the medical malpractice crisis" the Maryland General Assembly enacted CJP § 5-109 "to limit health care provider liability and provide insurers with a predictable period of potential liability." Nancy E. Leibowitz, *Statute of*

(Continued)

In *Newell v. Richards*, the Court of Appeals addressed the question of "which party bears the burden of proof when a defendant asserts that the three-year 'discovery' provision of § 5-109(a)(2) should bar a claim that is filed within the five-year provision of § 5-109(a)(1)." 323 Md. 717, 724-25 (1991). The Court held that the health care provider has the burden of proving when the injury was discovered, reasoning as follows:

> Since it is obvious that the primary purpose of Cts. & Jud. Proc. Art., § 5-109 is to create a total bar to malpractice actions brought after five years from the date of the alleged negligent treatment, and since **unquestionably the health care provider bears the burden of pleading and proving that the action is barred under the five-year provision**, we believe the legislature intended a single burden of proof and that **the health care provider have the burden of pleading and proving that the claimant's action is time-barred by either of the two statutory provisions.**

*Id.* at 728 (emphasis added). The Court explained further:

---

*Limitations—Medical Malpractice—Constitutional Law—Five Year Statute of Response on Medical Malpractice Claims That Commences When an Injury Occurs is Constitutional. Hill v. Fitzgerald, 304 Md. 689, 501 A.2d 27 (1985)*, 16 U. Balt. L. Rev. 571, 578 (1987). As enacted by Chapter 545 of the Acts of 1975, CJP § 5-109 provided as follows:

> An action for damages for an injury arising out of the rendering of or failure to render professional services by a physician shall be filed (1) within five years of the time the injury was committed or (2) within three years of the date when the injury was discovered, whichever is the shorter.

*See Rivera*, 347 Md. at 210 n.1. The new statute thus modified the common law discovery rule by allowing a plaintiff to file an action up to three years after she discovers an injury, but not beyond five years from the date the "injury was committed." *Hill*, 304 Md. at 699.

In 1976, CJP § 5-109 was amended to replace the word "physician" with the phrase "health care provider, as defined in § 3-2A-01 of this article[.]" *See Glenn v. Morelos*, 79 Md. App. 90, 93 (1989).

In 1987, CJP § 5-109 was amended to insert the phrase "within the earlier of" before the five-year and three-year limitations clauses ((a)(1) and (a)(2) respectively). Though the bill file contains no evidence of the General Assembly's purpose for the amendment, the Revised Fiscal Note indicates the phrase "whichever is the shorter," in the bill "establishe[d] a general statute of limitations for an action to be filed for damages in a medical malpractice case *to be the earlier of* 5 years from the time the injury is committed, or 3 years of the date the injury is discovered."

(Continued)

17

**If a health care provider pleads and proves that an action was filed after five years from the alleged negligent act, the action is time-barred.** If suit is brought within the five-year limitations period, the action will still be barred if the health care provider pleads and proves that the claim was not brought within three years of the date when "the injury was discovered."

*Id.* (emphasis added).

Notwithstanding its statement in *Newell* that an action "filed after five years from the *alleged negligent act*" is time-barred, the Court of Appeals has instructed that when an "injury" occurs is a question of fact to be determined in light of the principles announced in *Oxtoby v. McGowan*, 294 Md. 83 (1982), and *Hill v. Fitzgerald*, 304 Md. 689 (1985).[9] *See Rivera v. Edmonds*, 347 Md. 208, 211 (1997). Under the *Oxtoby-Hill* analysis, "injury may not coincide always with the date of an allegedly wrongful act or omission":

Although in *Hill* we called [CJP § 5-109] an "absolute bar," we set forth in the next breath the important principle that **"injury" occurs when the "allegedly negligent act was first coupled with harm."** This principle opens the door for and blesses claims arising from an allegedly negligent act that was more than five-years past, even if the injury—or cognizable legal harm—does not occur for many years.

*Anderson*, 427 Md. at 126-27 (emphasis added). The five-year period thus begins to run from the time the "injury" is determined to have occurred. In *Hill*, the Court "clarified" that "the five-year maximum period under the statute will run its full length only in those

---

[9] In *Hill v. Fitzgerald*, the Court interpreted CJP § 5-109 in light of the principles articulated in its prior decision in *Oxtoby v. McGowan*, in which it had considered the meaning of "medical injuries occurring" as used in the effective date clause of the Health Care Malpractice Claims Act ("HCMCA"). *See Oxtoby*, 294 Md. at 85. The *Hill* Court expressed that, while the HCMCA effective date provision "speaks of 'medical injury,' whereas [the effective date clause of CJP § 5-109] refers to 'injuries,' the legislature, in [the Court's] view, intended no substantive distinction in the legal application of the two terms." 304 Md. at 696-97.

18

instances where the three-year discovery provision does not operate to bar an action at an earlier date[,]" and "this is so without regard to whether the injury was reasonably discoverable or not." *Hill*, 304 Md. at 700.

We examined the *Oxtoby-Hill* principle in *Edmonds v. Cytology Services of Maryland, Inc.*, when we considered whether there was a factual dispute as to when Debra Ann Edmonds suffered an "injury" within the meaning of CJP § 5-109. 111 Md. App. 233, 247 (1996). Ms. Edmonds's husband, daughter, and estate (the appellants), filed wrongful death and survival claims against three physicians and Cytology Services of Maryland, Inc. in 1993, alleging that the health care providers had negligently failed to diagnose Ms. Edmonds's cervical cancer in 1983. *Id.* at 236. The appellants argued that "Ms. Edmonds was injured when she experienced pain and other symptoms in 1988," while the health care providers argued that, "if appellants' allegations are accepted as true, then Ms. Edmonds suffered an 'injury' when appellees negligently failed to diagnose her cancer in 1983 or 'certainly soon thereafter.'" *Id.* at 247.

After examining authority from other jurisdictions, we declined to adopt the view that "an 'injury' occurs when the patient 'discovers' the harm caused by the physician's negligent act." *Id.* at 250-51. Such a view, we explained, "would effectively re-incorporate into [CJP] § 5-109(a) the same open-ended discovery rule that the General Assembly sought to abolish" and "would render meaningless the dichotomy between [CJP] § 5-109(a)(1) and [CJP] § 5-109(a)(2)." *Id.* Consequently, we rejected "appellants' contention that Ms. Edmonds did not suffer an 'injury' until she began to experience pain or other symptoms from the cancer[.]" *Id.* at 251.

19

We also declined to adopt the interpretation that "injury" referred to the date when "the wrongful act or omission occurred" because CJP § 5-109(a)(1) "specifically declares" that the five-year period begins to run on the date the "injury was committed." *Id.* at 252, 254. The legislative history, we explained, "provides strong evidence that the General Assembly did not intend to create an ironclad rule that a medical malpractice claim would be barred if filed more than five years after the health care provider's wrongful act." *Id.* at 256. Rather, the General Assembly "wished to combat the 'long tail effect' on medical malpractice insurance" and "[s]imultaneously" "lessen the potential unfairness to victims of malpractice by not overly restricting their ability to present their claims." *Id.* at 257.

Next, we considered the Court of Appeals' prior instruction, in *Hill v. Fitzgerald*, that "an injury occurs when 'the negligent act [is] coupled with some harm [to create] a legally cognizable wrong.'" *Id.* at 257 (citing *Hill*, 304 Md. at 696). We concluded that "an 'injury' within the meaning of [CJP] § 5-109(a) is not 'committed' unless, as a proximate result of the wrongful act, the patient sustains damages." *Id.* at 262. And, "[o]nce damages are sustained, the health care provider's wrong is actionable, or 'legally cognizable[.]'" *Id.* On that basis, we rejected the health care providers' argument that "the limitations clock began to tick at the moment of the alleged misdiagnoses in 1983" because, had Ms. Edmonds filed suit at that time, "her suit may have been dismissed for lack of damages or lack of damages that could be proven with reasonable certainty." *Id.* at 263.

To conclude, we emphasized that the "five year period begins to run when injury (or 'damages') *first* arises, and not when *all* damages resulting from the physician's

negligence have arisen." *Id.* at 269.  We explained that a patient could suffer an "injury" from a negligent misdiagnosis,

> when (1) he or she experiences pain or other manifestation of an injury; (2) the disease advances beyond the point where it was at the time of the misdiagnosis and to a point where (a) it can no longer effectively be treated, (b) it cannot be treated as well or as completely as it could have been at the time of the misdiagnosis, or (c) the treatment would entail expense or detrimental side effects that would not likely have occurred had treatment commenced at the earlier time; or (3) the patient dies.

*Id.* at 270.  We noted that the list was not exhaustive, and "the overriding inquiry in all cases must be when the patient first sustained legally compensable damages" because the injury occurs "when legally compensable tort damages *first* occur, *regardless of whether those damages are discoverable or undiscoverable*." *Id.* (emphasis added).

Returning to Ms. Edmonds's case, we held that, "[g]iven the posture of a summary judgment proceeding, and in light of the evidence proffered by appellants," the trial court erred when it "determined, as a matter of law, that Debra Edmonds suffered an 'injury' at the moment of the alleged misdiagnoses in 1983." *Id.* at 263, 270.  We explained:

> Appellants did not proffer any expert opinion that Ms. Edmonds's cancer had not spread at any time prior to April 9, 1988 (i.e., the date five years prior to the filing of the claim) or April 11, 1985 (i.e., the date five years prior to Ms. Edmonds's death).  But appellees did not advance any evidence, beyond conclusory assertions, to show that Ms. Edmonds's cancer had advanced during those time periods.  Nor do appellees contend that [Ms.] Edmonds suffered any symptoms from the cancer prior to August 1988.

*Id.* at 272.  Consequently, it was error for the court to rule, "as a matter of law, that appellant[s'] claims were time-barred under the five year limitations provision in [CJP] § 5–109(a)(1)." *Id.*

21

The Court of Appeals granted the health care providers' petitions for certiorari to review our application of the rule from *Hill v. Fitzgerald*. *Rivera v. Edmonds*, 347 Md. 208, 216 (1997). In the Court's view, the decision "turn[ed] on the nature of microscopic cervical cancer, as revealed by the record." *Id.* at 222. The health care providers argued that, "[b]ecause the standard of care calls for surgery or radiation treatment when the condition is diagnosed, . . . any delay, and certainly a protracted delay, caused by a misdiagnosis is a harm within the meaning of *Hill*." *Id.* at 222-23. The Court explained that, ordinarily, it "would have no disagreement with that assessment in a case . . . where the uncontradicted evidence on summary judgment is that the undiagnosed cancer was progressing and worsening during the period following the misdiagnosis, even if the cancer was asymptomatic." *Id.* at 223 (citing *Jones v. Speed*, 320 Md. 249, 256 (1990)). In Ms. Edmonds's case, however, "the evidence most favorable to the party opposing summary judgment [wa]s that the cancer that allegedly should have been detected in Mrs. Edmonds in July 1983 could remain dormant for as long as five years." *Id.*

Because "[f]ive years from July 1983 would mean that the injury could have been 'committed' as late as July 1988, so that the five-year bar under [CJP § 5-109] did not operate until July 1993" and the "action was filed in April 1993," the Court concluded that the health care providers were not entitled to summary judgment. *Id.* After examining the legislative history of CJP § 5-109(a), the Court emphasized that

> [t]he General Assembly was well aware that, under [CJP § 5-109(a)] as construed in *Hill*, there could be a window of time between the negligent act

22

or omission and the resulting harm, and the General Assembly intended that the act operate in the fashion construed in *Hill*.[10]

*Id.* at 224-25. With regard to Ms. Edmonds's claims, the Court opined, "[t]he instant case, on the present record, illustrates that window." *Id.* at 225. Importantly, the Court noted that, in a case where the harm is *contemporaneous* with the negligence—such as in *Newell* where the negligence "was administering excessive radiation in the treatment of a cancer"—"on the facts of the case, one could speak of a bar measured by five years 'from the alleged negligent act.'" *Id.* at 208 n.8.

---

[10] Following the Court's decision in *Hill*, section 5-109 "was amended by Chapter 592 of the Acts of 1987 to add subsections (b) through (f)," and the language setting forth the three and five-year time periods "took its present format as subsection (a)." *Rivera*, 347 Md. at 224. "Chapter 592 was introduced as an Administration Bill," which "would have amended then § 5-109 to measure the five-year provision from the time of 'the allegedly wrongful act or omission,' and not from the time 'the injury was committed.'" *Id.* The Senate Judicial Proceedings Committee deleted the amendment, however, noting that the intent of the deleted language was to overturn the Court's decision in *Hill*. *Id.* Therefore, the Court explained in *Rivera*, "[t]he effect of the deletion . . . was to leave [CJP § 5-109(a)] substantially as it read when *Hill* was decided." *Id.* at 225.

We note here that subsections (b) through (f) are not relevant to this appeal. Subsection (b) provides that, "if the claimant was under the age of 11 years at the time the injury was committed, the time limitations prescribed in subsection (a) . . . shall commence when the claimant reaches the age of 11 years." CJP § 5-109(b). Subsection (c) bars the application of subsection (b) "to an action for damages for an injury . . . [t]o the reproductive system of the claimant; or . . . [c]aused by a foreign object negligently left in the claimant's body." CJP § 5-109(c)(1). For those injuries, "if the claimant was under the age of 16 years at the time the injury was committed, the time limitations prescribed in subsection (a) . . . commence when the claimant reaches the age of 16 years." CJP § 5-109(c)(2). Subsection (d) provides that filing a claim with the Health Care Alternative Dispute Resolution Office, in accordance with CJP § 3-2A-04, is deemed the filing of an action. CJP § 5-109(d). Finally, subsections (e) and (f) provide for the construction of CJP § 5-109 with CJP §§ 5-201 and 5-203.

23

## II.

## Analysis

### A. Ms. Thomas's Experts' Affidavits

Ms. Thomas concedes that "a party opposing a motion for summary judgment cannot create a dispute of material fact by offering a sham affidavit." She contends, however, that her experts' affidavits were not contradictory within the meaning of Maryland Rule 5-201(e) because Dr. Brown and Dr. Blond "stated by affidavit that their depositions included testimony based upon incomplete records." In Ms. Thomas's view, her experts "revisited and revised their causation opinions in light of a review of the full GBMC chart, as opposed to reviewing a cherry picked CT scan," and the "full chart review cannot be equated to a flat contradiction." Consequently, she argues that the affidavits created a material dispute of fact as to whether Dr. Shear caused Ms. Thomas harm in 2006, preventing a grant of summary judgment in Dr. Shear's favor.

Dr. Shear asserts that the court exercised sound discretion in finding that the affidavits of Dr. Brown and Dr. Blond were materially inconsistent with their sworn deposition testimony about the finding of hydronephrosis in July 2006. In light of Ms. Thomas's suggestion that there was no contradiction because the affidavits were based on the experts' review of the entire chart from GBMC in 2006 and not just the record they were shown at the time of their deposition, Dr. Shear contends that the "extent to which either expert elected to review or not review the July 19, 2006 chart prior to their depositions was not within [his] control[.]" Without the affidavits, Dr. Shear argues, the testimony "supports a conclusion that [Ms. Thomas] suffered a medical injury as of July

24

19, 2006 when she was diagnosed with 'moderate right hydronephrosis' per CT imaging" because it was "a clinical manifestation of the obstruction caused by the surgical clip – per the testimony of [Ms. Thomas's] own experts."

In this case, Dr. Brown's testimony about the 2006 GBMC admission, from his deposition on July 13, 2018, was as follows:

> [DEFENSE COUNSEL]: Doctor, I am going to show you – I had asked you if you've seen any reports from July of 2006. **I want to show you a CT scan of the abdomen that was taken in 2006.** I believe it was at GBMC, but I could be wrong about that.
>
> [DR. BROWN]: Lets see here. Yes, July of 2006.
>
> [DEFENSE COUNSEL]: **Have you seen that document before?**
>
> [DR. BROWN]: **I think I have, but I can't say for sure.** I'm reading it, you know, right hydronephrosis and proximal right hydroureter, without definite stone involved.
>
> [DEFENSE COUNSEL]: What does that mean?
>
> [DR. BROWN]: It's the same as all, you know, all these other things. It's some point with the clip there, she's getting hydronephrosis, okay?
>
> [DEFENSE COUNSEL]: Okay.
>
> [DR. BROWN]: So if this – **so in 2006 she had some hydronephrosis**.
>
> [DEFENSE COUNSEL]: **And do you believe the hydronephrosis that she had in 2006 relates back to the clip that was placed in 2000?**
>
> [DR. BROWN]: **It would be from the clip, yes**, because we know that there was a clip across the ureter.
>
> [DEFENSE COUNSEL]: And to be clear, what you've just reviewed in the report shows that there was no kidney stone causing an obstruction of the ureter in 2006, correct, as reported?

25

[DR. BROWN]: Correct. It says, [s]mall stones in the lower pole of the kidney, but there's no kidney stone causing the problem.

[DEFENSE COUNSEL]: If Ms. Thomas presented to the emergency department at [GBMC] in 2006 complaining of right flank pain do you have an opinion to a reasonable degree of medical probability what was causing the pain?

[DR. BROWN]: I don't know.

[DEFENSE COUNSEL]: Could it have been the hydronephrosis?

[DR. BROWN]: Could be.

[DEFENSE COUNSEL]: But you can't state that to a degree of medical probability?

[DR. BROWN]: **I don't know anything about those records**.

[DEFENSE COUNSEL]: If Ms. Thomas was suffering from hydronephrosis in 2006 unrelated to a kidney stone, but instead related to the clip that you say was placed in 2000 that was causing a pressure buildup in her ureter and backflow into the kidney with pressure in the kidney, correct?

[DR. BROWN]: Correct.

(Emphasis added).

In his affidavit, which was filed with Ms. Thomas's opposition to Dr. Shear's motion for summary judgment on September 25, 2018, Dr. Brown stated, in part:

3. I have reviewed Mrs. Thomas's July 19, 2006 GBMC emergency room visit, **the full chart which was not provided to me during my deposition.** [] The chart indicates her reason for the visit to be: "Rt. Flank pain, hematuria-DX with kidney stones".

\* \* \*

8. **My opinion is that the retained clip was not the cause of her right flank pain or any other clinical aspect of her clinical presentation**, such as the nausea, vomiting or hematuria (blood in the urine).

9. **My opinion is that the reason for the visit was the presence of right kidney stones**, which is the same diagnosis reached by the attending

26

physician, Dr. Walter Hettinger, as stated in the chart, "Your diagnosis for this visit: RIGHT KIDNEY STONE" and is the explanation for the nausea, vomiting, hematuria and her hydronephrosis. **My opinion is based upon a review of the full chart, which I was not provided during my deposition**, and my background, and experience.

(Emphasis added).

Dr. Blond's deposition testimony, from August 31, 2018,[11] regarding Ms. Thomas's 2006 GBMC admission was as follows:

[DEFENSE COUNSEL]: **Nevertheless [you] were provided with some records from GBMC in 2006 in which she was seen for kidney stones, correct?**

[DR. BLOND]: **That's correct.** I[t] was for right sided pain and . . . that is correct.

[DEFENSE COUNSEL]: Okay. And she was diagnosed with moderate right hydronephrosis by CT scan, correct?

[DR. BLOND]: Correct.

[DEFENSE COUNSEL]: **Do you have an opinion to a reasonable [] degree of medical probability as to what the cause of the hydronephrosis was in 2006?**

[DR. BLOND]: **Yes. I believe i[t] was from [] again the original clip in 2000.**

(Emphasis added).

Dr. Blond's affidavit, which was also filed with Ms. Thomas's opposition to Dr. Shear's motion to dismiss, provided, in part:

3. I have reviewed Mrs. Thomas's July 19, 2006 GBMC emergency room visit. [] The chart indicates her reason for the visit to be: "Rt. Flank pain, hematuria-DX with kidney stones".

---

[11] Only a rough draft of the transcript for Dr. Blond's deposition was part of the record at summary judgment. For clarity, we have included minor edits in brackets.

\* \* \*

8. **My opinion is that the retained clip was not the cause of her right flank pain or any other clinical aspect of her clinical presentation**, such as the nausea, vomiting or hematuria (blood in the urine).

9. **My opinion is that the reason for the visit was the presence of right kidney stones**, which is the same diagnosis reached by the attending physician, Dr. Walter Hettinger, as stated in the chart, "Your diagnosis for this visit: RIGHT KIDNEY STONE" and is the explanation for the nausea, vomiting, hematuria and her hydronephrosis. **My opinion is based upon a review of the full chart, which I was not provided during my deposition**, and my background, experience, and training as a hospitalist who has treated hundreds of patients with a similar diagnosis of kidney stones.

(Emphasis added).

Maryland Rule 2-501(b) provides that a response to a motion for summary judgment that asserts the existence of a material fact or controverts any fact in the record must be supported by an affidavit or other written statement under oath. But, under subsection (e), a party may move to strike an affidavit "to the extent that it contradicts any prior sworn statement of the person making the affidavit or statement." Md. Rule 2-501(e). "Prior sworn statements include (A) testimony at a prior hearing, (B) an answer to an interrogatory, and (C) deposition testimony that has not been corrected by changes made within the time allowed by Rule 2-415." Md. Rule 2-501(e)(1).

In general, if the court finds that the affidavit "materially contradicts the prior sworn statement, the court must strike the contradictory part[.]" Md. Rule 2-501(e)(2). The court is not required to strike a contradictory affidavit if it determines that:

(A) the person reasonably believed the prior statement to be true based on facts known to the person at the time the prior statement was made, and (B) the statement in the affidavit . . . is based on facts that were not known to the person and could not reasonably have been known to the person at the time the prior statement was made or, if the prior statement was made in a

28

deposition, within the time allowed by Rule 2-415(d) for correcting the deposition.

*Id.* As stated by the Court of Appeals in *Marcantonio v. Moen*, the purpose of subsection (e) is to "strike affidavits that contain factual assertions that are not genuine[,]" although the motions court should not make credibility determinations in evaluating affidavits. 406 Md. 395, 412 (2008).

The Court further explained that a "material contradiction under 2-501(e) is a factual assertion that is significantly opposite to the affiant's previous sworn statement so that when examined together the statements are irreconcilable." *Id.* at 410. Accordingly, an affidavit contains a "material contradiction" to a prior statement and would be properly struck under Rule 2-501(e) when both the affidavit and the prior statement could not have been true. *Id.* at 410-11. Conversely, there is no material contradiction where the statements are reconcilable, and there is no clear and explicit contradiction between the affidavit and deposition testimony. *See id.* at 411.

As an example of an affidavit that does not materially contradict prior sworn testimony, the *Marcantonio* Court referred to the affidavit that was considered in *Hinch v. Lucy Webb Hayes National Training School*, 814 A.2d 926 (D.C. 2003). *See Marcantonio*, 406 Md. at 411. In *Hinch*, a medical malpractice case, Paget Hinch claimed that her injuries stemmed from a hospital's failure to administer her anticonvulsant as prescribed. 814 A.2d at 928. Ms. Hinch's expert witness, Dr. Helene Emsellem, had testified during her deposition that Ms. Hinch's condition could have resulted from the withdrawal of anti-seizure medication or could have arisen from other causes. *Id.* In opposing the hospital's

motion for summary judgment, however, Ms. Hinch included an affidavit of Dr. Emsellem, in which she stated to a reasonable degree of medical certainty that the hospital's negligence was "more likely than anything else to have been the cause" of Ms. Hinch's injuries. *Id.* The trial court viewed the affidavit as a sham and refused to consider it because, in the court's view, the affidavit contradicted Dr. Emsellem's deposition, rather than correcting or supplementing it. *Id.* After disregarding the affidavit, the trial court granted summary judgment in favor of the hospital on the ground that Ms. Hinch failed to provide sufficient evidence of causation. *Id.*

The appellate court vacated the grant of summary judgment, concluding that the "discrepancies between the deposition testimony and the assertion in the affidavit [we]re not sufficiently stark and contradictory to warrant the application of the [sham affidavit] doctrine." *Id.* at 927. The court reasoned that Dr. Emsellem's statement in her affidavit, that the hospital's negligence was "more likely than any other" to have caused Ms. Hinch's injury, did not materially contradict her earlier deposition testimony where she discussed several possible causes but "could not 'tease apart' which was in fact the cause." *Id.* at 931. To conclude, the court emphasized that, "at a minimum, for the sham affidavit doctrine to apply, there must be a *clear and explicit contradiction* between what is said at the deposition and what is said in the affidavit." *Id.* (emphasis added).

Here, the deposition testimony from Dr. Blond and Dr. Brown that the surgical clip caused Ms. Thomas's 2006 hydronephrosis is explicitly opposite to their affidavit statement that kidney stones, and not the surgical clip, caused the hydronephrosis. Had the experts indicated during their depositions that they could not "tease apart" which of several

30

possibilities was the actual cause of Ms. Thomas's symptoms in July 2006, then their deposition testimony could be reconcilable with the affidavits. *See Marcantonio*, 406 Md. at 411. But here, in each case, because the expert directly refuted his deposition testimony by his affidavit, the deposition testimony and the affidavit cannot both be true. Plainly, the experts' affidavits contain material contradictions to their prior sworn deposition testimony.

The court properly rebuffed Ms. Thomas's effort to seek remittal for these contradictions under Md. Rule 2-501(e)(2). Clearly the court was not persuaded by the pretext that plaintiff's experts merely reformulated their opinions after reviewing the full chart because they were shown a "cherry picked" CT scan during their depositions. Ms. Thomas did not allege below (nor on appeal) that the defense failed to provide her experts with the full chart from 2006. Dr. Brown and Dr. Blond both had the opportunity to review the discovery materials and formulate an opinion about the timing and manifestation of Ms. Thomas's injury before they were deposed. Moreover, Ms. Thomas's experts had an opportunity to correct their deposition testimony if they were dissatisfied with the answers they provided. *See* Md. Rule 2-415(d) ("Within 30 days after the date the officer mails or otherwise submits the transcript to the deponent, the deponent shall (1) sign the transcript and (2) note any changes to the form or substance of the testimony in the transcript on a separate correction sheet, stating the reason why each change is being made."). We hold, therefore, that the court correctly determined that the affidavits were materially inconsistent and should be disregarded.

31

# III.

## Burden of Proof and Dr. Shear's Experts

Ms. Thomas argues next that, even without her experts' affidavits, she "created a material issue of fact once [she] submitted Drs. Black's and Harryhill's deposition testimony" in which they opined that the 2006 hydronephrosis was not caused by Dr. Shear's negligence. Ms. Thomas acknowledges that Dr. Shear "would probably win on the merits" if the jury were to accept the opinion that Dr. Shear "did not insert a clip across [Ms. Thomas's] ureter and that the hydronephrosis was caused by renal cholic or kidney stones." Nevertheless, she asserts that "such a consideration holds no moment when the court is deciding whether to allow the case to proceed to a jury." Enigmatically, she contends that Dr. Shear cannot sustain his burden of proving that her 2006 presentation at the hospital documented an injury caused by his alleged negligence.

Dr. Shear urges that Ms. Thomas should not be permitted to "adopt the testimony of [his] experts in attempting to create a material dispute of fact" and to disregard her own experts' testimony. He contends that Ms. Thomas "continues to ignore the fact that both Dr. Black and Dr. Harryhill disagree with [her] theory that a surgical clip was placed over the ureter in May, 2000" and, therefore, "it would be illogical for them to conclude that the July 19, 2006 hydronephrosis was due to a surgical clip on the ureter." Dr. Shear further asserts that, "[t]o the extent that [Ms. Thomas] would like to adopt the testimony of [his] experts in attempting to create a material dispute of fact, then [she] would need to acknowledge that there was no deviation from accepted standards of care in the first place."

We agree with Dr. Shear that the circuit court properly disregarded Ms. Thomas's attempt to create a genuine dispute of material fact with the defense experts' testimony. The judge observed astutely the implications of Ms. Thomas's request:

> What are you going to do at trial, call their experts? What about your own experts. They didn't give testimony to support that position. **And I go back to the theory of recovery in this case, what you set forth in the complaint. And also I'm looking back in the file at the certificate of qualified expert and written report of Dr. B[eatt]y**[12] . . . – **the Plaintiff submitted that from Dr. B[eatt]y and Dr. B[eatt]y contended that "the only explanation can be that Dr. Shear, the Defendant, failed to identify the ureter and placed an occluding clamp on it resulting in an impossibility to be repaired." I mean, that is the Plaintiff's theory of the case.** And now you are telling me to rely on what the defense experts have said about what happened when the Plaintiff went to GBMC with those complaints in July of 2006.

(Emphasis added). We are similarly unpersuaded that Ms. Thomas could rescue her case from the detrimental testimony of her own experts by relying on the testimony of the defense experts.

"To defeat a defendant's motion for summary judgment, the opposing party must present admissible evidence 'upon which the jury could reasonably find for the plaintiff.'" *Rogers v. Home Equity USA, Inc.*, 453 Md. 251, 263 (2017) (quoting *Hamilton v. Kirson*, 439 Md. 501, 522-23 (2014)). Ms. Thomas asks this Court, as she asked the circuit court, to apply the testimony of Dr. Black and Dr. Harryhill, that the 2006 hydronephrosis was not caused by Dr. Shear's alleged negligence, for the limited purpose of establishing that

---

[12] Albert Beatty, Jr., M.D. prepared the "certificate of qualified expert" and report that Ms. Thomas submitted to the Health Care Alternative Dispute Resolution Office. Dr. Beatty was not deposed during the discovery period. Dr. Shear explained in his motion for summary judgment that, "[u]pon information and belief, one of the Plaintiff's retained experts (Albert Beatty, M.D.) is now deceased."

33

her "injury" did not occur in 2006. But, as Ms. Thomas concedes in her brief, the defense experts did not testify that there was no injury in 2006, full stop. Rather, their opinion was that no clip was ever misplaced across her ureter, and that she never suffered an injury attributable to Dr. Shear in 2000, 2006 or 2014. Because Ms. Thomas cannot adopt the defense experts' testimony to avoid the statute of limitations without concomitantly sinking her prima facie case, we conclude that her submission of Dr. Black and Dr. Harryhill's testimony did not preclude the circuit court from granting summary judgment in favor of Dr. Shear.

Likewise, we reject Ms. Thomas's contention that Dr. Shear was not entitled to summary judgment because he did not sustain his burden of proving that she sustained an injury in 2006 attributable to his negligence. Ms. Thomas misconstrues the burdens required of each party to both sustain and defend the cross-motions for summary judgment under CJP § 5-109. As the health care provider, Dr. Shear had the "burden of pleading and proving that the action is barred under the five-year provision [of CJP § 5-109(a)]." *Newell*, 323 Md. at 728. And, as the party moving for summary judgment, the burden was upon Dr. Shear to demonstrate an absence of material fact and that he was entitled to judgment as a matter of law. *See Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 660 (2000). Dr. Shear demonstrated in his motion that he was entitled to judgment as a matter of law because the surgery that Ms. Thomas alleges caused her harm occurred in May 2000, and the lawsuit was not filed in the underlying case until 2016—eleven years outside the controlling five-year limitations period. CJP § 5-109(a).

The moving party having met the initial burden of establishing the "absence of a genuine issue of material fact," the burden shifted to Ms. Thomas to show why the applicable statute of limitations did not bar her claim as a matter of law, or "identify with particularity the material facts that are disputed." *Nerenberg*, 131 Md. at 660 (citations omitted). She could do that, for example, by demonstrating that the date of the surgery was not "the time the injury was committed." *See Anderson*, 427 Md. at 126; *Rivera*, 347 Md. at 225. Alternatively, she could have presented evidence of fraud by Dr. Shear to establish that CJP § 5-203 applied to toll the statute of limitations. *See* CJP § 5-203 (tolling the limitation period for fraud); CJP § 5-109(f)(2) (providing that nothing in § 5-109 limits the application of § 5-203).

In her initial opposition to Dr. Shear's motion for summary judgment Ms. Thomas stated that it was "*undisputed* that on May 26, 2000, the defendant performed an aorto-bifemoral bypass graft on the plaintiff at GBMC." (Emphasis added). Before this Court, Ms. Thomas acknowledges that the basis of her claim is the allegation that "[o]n May 26, 2000," Dr. Shear "*committed medical malpractice* when he placed a surgical clip on [her] right ureter during an aorto-fem[o]ral bypass procedure." (Emphasis added). She attacks the court's grant of summary judgment by arguing that Dr. Shear "failed to introduce any opinion that [her 2006] presentation was caused by anything other than renal cholic or kidney stones." But it was never Dr. Shear's burden to prove that he caused Ms. Thomas injury in 2006. Instead, it was her burden to demonstrate that there was a genuine issue of material fact precluding a finding that Dr. Shear met his burden of showing that her 2016 claim was time-barred.

35

## IV.

### CJP § 5-109(a)(1)—When Was the Injury Committed?

Ms. Thomas contends that all of the expert testimony in the matter comes to the same conclusion: her "clinical signs and symptoms on July 19, 2006 were not caused by the clip on the ureter, even if the CT finding of hydronephrosis was assumed to be caused by the clip on the ureter." Because the 2006 "injury" was not caused by the clip, Ms. Thomas asserts that she did not sustain a cognizable injury within the meaning of CJP § 5-109 at that time. Consequently, Ms. Thomas concludes that "if a motion for summary judgment were to be granted, it should have been granted in [her] favor."

Dr. Shear counters that plaintiff's experts' testimony "supports two [] alternative conclusions as to the date of injury – both of which required a finding that [Ms. Thomas's] claim is time barred" under CJP § 5-109(a). First, that Ms. Thomas "suffered a medical injury on May 26, 2000 given that the placement of the surgical clip would have caused a complete or partial blockage of the ureter which would have caused a pressure increase in the ureter[.]" Second, "even assuming *arguendo* that the complete or partial blockage of the ureter as of that date does not constitute a legally cognizable medical injury," plaintiffs' experts' testimony "supports a conclusion that [she] suffered a medical injury as of July 19, 2006 when she was diagnosed with 'moderate right hydronephrosis' per CT imaging."

### A. The Discovery Rule

We preface our analysis with the annotation that neither the three-year period presented in CJP § 5-109(a)(2) nor the common law discovery rule applies here. Although

36

Ms. Thomas does not mention § 5-109(a)(2) in her argument on appeal,[13] to the extent she

contends that her claim did not accrue until she "discovered" the harm caused by Dr.

Shear's alleged negligence (i.e., when she sought treatment for abdominal pain in 2014),

she incorrectly invokes the common law discovery rule.  Chief Judge Robert Murphy's

expository writing in *Hill* clarifies why CJP § 5-109(a)(2) is not coterminous with the

common law discovery rule:

> [W]e think that the words of § 5-109 expressly place an absolute five-year
> period of limitation on the filing of medical malpractice claims calculated on
> the basis of when the injury was committed, *i.e.,* the date upon which the
> allegedly negligent act was first coupled with harm.  The purpose of the
> statute, readily evident from its terms, was to contain the "long-tail" effect of
> the discovery rule in medical malpractice cases by restricting, in absolute
> terms, the amount of time that could lapse between the allegedly negligent
> treatment of a patient and the filing of a malpractice claim related to that
> treatment.  The statute is a response to the so-called crisis in the field of
> medical malpractice claims[.] . . . ***Indeed, the five-year maximum period***
> ***under the statute will run its full length only in those instances where***
> ***the three-year discovery provision does not operate to bar an action at an***
> ***earlier date.  And this is so without regard to whether the injury was***
> ***reasonably discoverable or not.***

*Hill v. Fitzgerald*, 304 Md. 689, 699–700 (1985) (emphasis added).

In *Edmonds*, we declined to adopt the view "that an 'injury' occurs when the patient

'discovers' the harm caused by the physician's neglect" because it "would effectively re-

---

[13] Before the trial court, counsel for Ms. Thomas advanced somewhat conflicting arguments.  When asked by the trial court whether Ms. Thomas's argument was "that the injury wasn't *discovered* until 2014," counsel replied, "No. . . . I'm arguing that *there is no injury between 2000 and 2014*; that the first injury was that pain to her right side when she went to the hospital and said so [on January 5, 2014]."  (Emphasis added).  Counsel later reiterated, "our position is there are two different things.  The act which was done admittedly in 2000. . . and *the manifestation and the actual injury leading to the discovery and that was 2014*.  And that would be the time that would start the clock."  (Emphasis added).

incorporate into [CJP] § 5-109(a) the same open-ended discovery rule that the General Assembly sought to abolish" and "would render meaningless the dichotomy between [CJP] § 5-109(a)(1) and [CJP] § 5-109(a)(2)." 111 Md. App. at 251. We further noted that the interpretation would "contradict the Court's statement in *Hill v. Fitzgerald* that the five year period in [CJP] § 5-109(a)(1) runs 'without regard to whether the injury was reasonably discoverable.'" *Id.* (citing *Hill*, 304 Md. at 700)).

## B. Defining "Injury"

We turn now to the question of when the "injury was committed," thereby triggering the five-year limitation period under CJP § 5-109(a)(1). Ms. Thomas relies heavily on our statement in *Edmonds* that "the General Assembly did not intend to create an ironclad rule that a medical malpractice claim would be barred if filed more than five years after the healthcare provider's wrongful act." *See* 111 Md. App. at 256. On that basis, she urges that her injury did not occur until 2014 when she presented to Northwest Hospital Center with severe abdominal pains.

Although our decisional law, as set out above, does confirm that "injury may not coincide always with the date of an allegedly wrongful act or omission," *Anderson*, 427 Md. at 126, this Court also reiterated in *Edmonds* the rule "that the five year period begins to run when injury (or 'damages') *first* arises, and not when *all* damages resulting from the physician's negligence have arisen." *Edmonds*, 111 Md. App. at 269. We derived from the Court's opinions in *Hill* and *Oxtoby* that "all that is required for an injury to exist 'is that the negligent act be coupled with *some* harm" and the "date of injury is the date when

38

the injury first arises, even if all of the resulting damages do not occur until later." *Id.* (citations omitted).

An examination of cases in which this Court and the Court of Appeals have found that there was a "window of time between the negligent act or omission and the resulting harm," *Rivera*, 347 Md. at 225, reveals that this window appears most often in cases involving misdiagnosis or failure to diagnose. *See, e.g.*, *id.* at 223, 225 (determining that, because the cancer that plaintiff alleged pathologists should have detected in 1983 "could remain dormant for as long as five years," there was a window of time between the allegedly negligent failure to diagnose and the resulting harm"); *Hill*, 304 Md. at 692 (involving alleged negligence in "diagnosing [the plaintiff's] ailment to be multiple sclerosis when, in fact, he was suffering from a spinal tumor").

The few reported cases that arise outside of the misdiagnosis and failure to diagnose context better illustrate the situation contemplated by the Court in *Rivera*, where the "harm is contemporaneous with the negligence." 347 Md. at 208 n.8 (explaining that, because the "negligence in *Newell* was administering excessive radiation in the treatment of a cancer," the harm was contemporaneous with the negligence). For example, in *Crystal v. Midatlantic Cardio Vascular Associates, P.A.*, this Court considered the application of the statute of limitations for medical malpractice claims in the context of the placement of an allegedly unnecessary stent. 227 Md. App. 213, 216 (2016). The appellant, Jan Crystal, underwent a "cardiac catheterization" in October of 2004, at which time a stent was placed in his left anterior descending coronary artery ("LAD"). *Id.* at 216-17. In November 2004, he underwent a second catheterization, performed by Mark Midei, M.D, during which Dr.

Midei placed another stent in Mr. Crystal's LAD. *Id.* at 218-19. Prior to the second procedure, Mr. Crystal had signed a consent form that authorized Dr. Midei to perform certain medical procedures, including a stent implementation, and "left the decision, of whether to place a stent, to the medical judgment of Dr. Midei." *Id.* at 218-19.

In 2009, five years after the stent implantation, Mr. Crystal contacted an attorney after reading an article "suggesting that Dr. Midei had been performing 'unnecessary' stent implantation procedures." *Id*. at 220. Then, in 2011, almost seven years after the stent implantation procedure had been performed by Dr. Midei, Mr. Crystal filed a claim with the Health Care Alternative Dispute Resolution Office against the three appellee health-care providers alleging medical malpractice, fraud by intentional misrepresentation, and fraud by concealment. *Id.* at 216, 220.

The matter was transferred to the Circuit Court for Baltimore County after arbitration was waived. *Id.* at 220. The health care providers moved for summary judgment, contending that there was no evidence of fraud and, in the absence of such evidence, the five-year medical malpractice statute of limitations had not been tolled and Mr. Crystal's claims were time-barred. *Id.* at 221. The circuit court agreed and granted the appellees' motions. *Id.* at 222-23. We affirmed. *Id.* at 233.

We determined that the circuit court properly granted summary judgment, and held that, "without any evidence of fraud that would toll the statute of limitations, the circuit court was impelled to find, as it did, that Crystal's remaining medical malpractice claims were time-barred." *Id.* at 230, 233. Mr. Crystal "concede[d] that he did not file his

complaint within the required five-year statute of limitations period," but hoped his claim was tolled by showing of fraud under CJP § 5–203. *Id.* at 232.

Similarly, in *Glenn v. Morelos*, our predecessors concluded that "[b]ecause the 'injury' in this case occurred in 1980 and the claim was not filed with the Health Claims Arbitration office until 1986, the claim was barred by § 5-109 as it then existed and was properly dismissed." 79 Md. App. 90, 101 (1989). The underlying complaint alleged that Dr. Jose Morelos was negligent "in the performance of a surgical procedure in the area of [Queen] Glenn's left ear on 15 May 1980, which caused a permanent and disfiguring paralysis of her face." *Id.* at 94. Although our decision rested on other grounds, we again did not consider the "injury" to have occurred at any time other than that of the allegedly negligent surgical procedure.[14]

---

[14] The dispositive issue before this Court in *Glenn* was the effect of CJP § 5-203 on CJP § 5-109, "prior to the amendment of the latter by Ch. 592 of the Acts of 1987 to provide that nothing in § 5-109 limits the application of, *inter alia*, § 5-203." 79 Md. App. at 91-92 (citation omitted). Section 5-203 provided:

> If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

*Id.* at 93. We observed that the 1987 Act stated, "unequivocally, [] that it applies only to actions arising from events occurring on or after 1 July 1987, and that it may *not* be applied or interpreted to have any effect upon or application to events occurring prior thereto." *Id.* at 98. Accordingly, we held that, "by the express mandate of the General Assembly, § 5-203 [] did not apply to medical malpractice injuries occurring between 1 July 1975 and 1 July 1987." *Id.* at 92.

The Glenns had alleged in their complaint "that Dr. Morelos fraudulently concealed the facts from the Glenns so that they were kept in ignorance of their cause of action until August of 1986." *Id.* at 94. Because Ms. Glenn's injury occurred in 1980, CJP § 5-203 could not operate to toll the five-year statute of limitations and, therefore, the Glenns' 1986 claim was untimely. *Id.* at 101.

(Continued)

**Surgery in 2000**

In the matter before us now, the parties agree that the "alleged negligent act" took place in 2000, when Dr. Shear performed the aorto-femoral bypass graft on Ms. Thomas. Dr. Shear, in light of his burden to prove and plead that Ms. Thomas's claim was time-barred by CJP § 5-109(a), points to her experts' testimony and argues that it "supports a conclusion that [Ms. Thomas] suffered a medical injury on May 26, 2000[.]" We agree.

Plaintiff's expert, Dr. Brown, deposed that a clip was placed on the right ureter during the 2000 surgery, and he believed that there was narrowing of the ureter at that time. While Dr. Brown could not say how much of the narrowing in Ms. Thomas's ureter was caused by the clip, he "would assume that most of the narrowing of the ureter is from the clip and there might [be] some smaller additional amount from fibrosis or scarring at the end of that[,]" but it was "a safe assumption to say that most of it is going to be from the clip[.]" Dr. Brown further testified that the "clip doesn[']t move or [] go out farther or take more over time." Thus, when asked whether "an obstruction of the ureter which, at the very least, was causing some pressure buildup in the ureter up to the kidney" started in 2000, Dr. Brown stated, "Yes, it all started in 2000."

---

Since CJP § 5-109 was amended in 1987, the tolling provision of CJP § 5-203 has applied in medical malpractice cases. *See, e.g.*, *Crystal v. Midatlantic Cardiovascular Assocs., P.A.*, 227 Md. App. 213, 232-33 (2016) (concluding that § 5-203 did not toll the five-year statute of limitations period in § 5-109 because the plaintiff failed to present any evidence of fraud by the health care provider); *Anderson v. United States*, 427 Md. 99, 111 (2012) (noting that the 1987 amendments to § 5-109 "added [an] explicit provision[s] allowing for § 5-203 (tolling the limitation period for fraud) to apply to medical malpractice actions).

Dr. Brown likened Ms. Thomas's situation to "if someone had left a pair of scissors or forceps in the belly":

> When is that person going to get into trouble with it? They may never get into trouble with it. They probably will. Some people might be in trouble in three months and some people you might find it ten years later. There[']s just no way to predict when you[']re going to get into trouble and there[']s no way to predict here what the kidney is going to do. Now, if you only had one kidney and that was her only kidney you[']d probably be finding out about this earlier. But, because you only need one kidney to live when something happens to one you may very well not know it for a long time.

Similarly, Dr. Blond testified that "from a causation standpoint, [he's] going back to where things started[,]" meaning "[w]here that kidney became initially injured." He explained further: "[t]here was evidence when we looked at her current records that there was a surgical clip at the level of her obstruction which was described at the S1 level. And I believe that that was the likely cause of her developing hydronephrosis."

Viewing the evidence in the light most favorable to Ms. Thomas, Dr. Shear negligently placed a clip on her right ureter during the 2000 procedure. The plaintiff's expert testimony establishes that, at that time, the clip was causing narrowing of the right ureter, which led to at least some pressure building in Ms. Thomas's kidney. Plaintiff's experts did not demonstrate that the injury was not committed in 2000; to the contrary, they proved that the harm to Ms. Thomas was contemporaneous with the negligence. Consequently, we are persuaded that Ms. Thomas suffered an "injury" in 2000, even though she may not have experienced pain at that time. Accordingly, we hold the circuit court correctly granted Dr. Shear's motion for summary judgment because she failed to file

her claim by 2005, or within "[f]ive years of the time the injury was committed." CJP § 5-109(a)(1).

## 2006 Procedure

Dr. Shear's alternate contention, as adopted and expressed by the trial court, is that the statute of limitations "ran at the latest when [Ms. Thomas] presented to GBMC in 2006[.]" Again, we agree.

Although the final diagnosis for the 2006 visit was kidney stones, both the abdomen and pelvis CT scan findings indicated the presence of "multiple clips," and "[m]oderate right hydronephrosis and proximal right hydroureter,[15] without definite stone identified." Consequently, viewing the evidence in the light most favorable to Ms. Thomas, as a result of the alleged negligence of Dr. Shear in placing the clip, Ms. Thomas suffered harm in her kidneys in 2006. "That constitutes a 'hurtful or damaging effect' (*Oxtoby*) . . . and it clearly falls within the scope of 'pain or other manifestation of an injury' under *Rivera*." *Green v. N. Arundel Hosp. Ass'n, Inc.*, 366 Md. 597, 612 (2001).

---

[15] As noted above, hydronephrosis refers to dilation of the pelvis of the kidney, which can occur when urine cannot drain out of the kidney to the bladder. Plaintiff's expert, Dr. Brown, explained,

> [I]f we were to say that you had hydronephrosis, you know, an enlarged kidney and a large collection system and the ureter above the blockage is dilated[,] then we know that that[']s essentially pressurized and that would tell us everything that is supposed to be going through isn[']t under the normal pressures.

Hydroureter, on the other hand, refers to "[d]ilation of a ureter." *Stedman's Medical Dictionary* 2071 (28th ed. 2006).

Ms. Thomas's experts stated during their depositions that the clip that was allegedly placed during her 2000 procedure caused the hydronephrosis detected during her 2006 visit to GBMC. Dr. Brown testified that, although the CT scan showed "[s]mall stones in the lower pole of the kidney," there was no "kidney stone causing the problem" in Ms. Thomas's ureter and, therefore, the 2006 hydronephrosis "would be from the clip . . . across the ureter." Dr. Blond opined, to a reasonable degree of medical probability, that the cause of the hydronephrosis in 2006 was the "original clip in 2000."

Ms. Thomas cannot run away from the testimony of her experts establishing that the statute of limitations began to run at the latest when she presented to GBMC in 2006. Her entreaty to circumvent the date of the surgery and alleged malpractice in 2000, then leap over the clear manifestation of injury in 2006, to reach an initial injury date in 2014 so to avoid the statute of limitations, is, as a British commander once observed during WWII, "a bridge too far."[16]

---

[16] The phrase is attributed to British Lieutenant General Frederick Browning, a key figure in the Allied forces' failure at the Battle of Arnhem in September 1944, better known by its codename "Operation Market Garden." The operation was aimed at capturing three primary bridges in and around Arnhem, a city in the Netherlands near the German border, considered crucial to hastening the war's conclusion. With Arnhem captured, the Allied forces would have had a strategic point to march directly toward Berlin. The Allied forces engaged in a protracted struggle and captured two of the primary bridges before exhausting supplies and capabilities. After reinforcements shored up the Nazi forces, the depleted Allied forces failed to secure the final bridge over the Neder Rijn River, and the operation collapsed. The idiom became popular after General Browning's quote was used as the title to Cornelius Ryan's 1974 account, upon which a 1977 motion picture carrying the same name was based. *See* CORNELIUS RYAN, A BRIDGE TOO FAR (1974) (detailing the plans of Operation Market Garden and its subsequent execution); *see also* ANTONY BEEVOR, THE BATTLE OF ARNHEM: THE DEADLIEST AIRBORNE OPERATION OF WWII (2018).

For all of the reasons stated above, we affirm the decision of the circuit court denying Ms. Thomas's motion for partial summary judgment and granting summary judgment in favor Dr. Shear.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**